[No. G031625. Fourth Dist., Div. Three. Mar. 2, 2004.]

BRYAN FRANKLIN et al., Plaintiffs and Appellants, v.
DYNAMIC DETAILS, INC., et al., Defendants and Respondents.

COUNSEL

Roxborough, Pomerance & Nye, Nicholas P. Roxborough, Karin R. Leavitt and Lorne Lilienthal for Plaintiffs and Appellants.

Payne & Fears, Daniel M. Livingston and Donald P. Breese for Defendants and Respondents.

## OPINION

**FYBEL, J.—**

### INTRODUCTION

Bryan Franklin and Franklin-Choi Corporation (FCC) sued Dynamic Details, Inc. (DDi), and Jim Axton, contending three e-mail messages that Axton prepared and sent to companies with which Franklin and FCC did business were defamatory and caused interference with contractual and prospective economic relationships. The trial court concluded the e-mails contained statements that were defamatory on their face, but granted summary judgment in favor of DDi and Axton on the ground the e-mails were privileged communications under Civil Code section 47, subdivision (c).

We affirm. With respect to the causes of action for libel and trade libel, the dispositive issue is not whether the e-mails were privileged under Civil Code section 47, subdivision (c). Rather, the dispositive issue is whether the e-mails were actionable as libel; more specifically, whether the e-mails contained opinions based upon fully disclosed, provably true facts. (See *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 19 [111 L.Ed.2d 1, 110 S.Ct. 2695] (*Milkovich*); *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438–1439 (*Standing Committee*).) In compliance with Code of Civil Procedure section 437c, subdivision (m)(2), at oral argument we invited the parties to submit supplemental briefs on that issue. We commend the parties on the excellent letter briefs they submitted.

■ We hold two of Axton's e-mails were not actionable as libel or trade libel because they expressed Axton's opinions and fully disclosed provably true facts on which the opinions were based. Axton's e-mails contained statements that would be defamatory per se if actionable. The statements in Axton's e-mails expressed Axton's opinions because they purported to apply copyright and contract law to facts to reach the conclusion Franklin and FCC were acting unlawfully. The e-mails disclosed the facts upon which the opinions were based by directing the reader to the FCC Web site and (via a Web link on the FCC Web site) to another company's Web site. The Web sites were provably true because their existence, content, and layout were not in dispute in any material way. A reader of the e-mails could view those Web sites and was free to accept or reject Axton's opinions based on his or her own independent evaluation. Our conclusion is the result of an application of the principles of *Milkovich* and *Standing Committee* and, in our view, strikes the proper balance between constitutional guarantees of free speech and the interest in preventing attacks on reputation. The third e-mail was not actionable because the statements were true or vague.

With respect to the causes of action for interference with contractual relationships and interference with prospective economic advantage, we

conclude, as the trial court did, Franklin and FCC failed to meet their burden of submitting evidence showing a triable issue of fact exists as to whether the e-mails caused them damage.

FACTS

Franklin formed FCC in 1995 and has been its sole shareholder since late 1998. FCC serves as a sales representative for vendors of electronic testing products and equipment, including USA MicroCraft, Inc. (MicroCraft), and Test-X Fixture Products (Test-X). FCC was MicroCraft's exclusive sales representative in the western United States, and MicroCraft was FCC's largest source of business.

DDi provides design and manufacturing services to the electronics manufacturing industry. Axton is DDi's corporate director of test. MicroCraft sold DDi several moving contact probers for high speed precise testing of printed circuit boards. Franklin testified in his deposition this was an "important" relationship and both DDi and MicroCraft "needed each other."

On May 7, 2001, Franklin sent an advisory e-mail to all of his electronic sales contacts, including Axton, stating: "Test-X has made its' [*sic*] site more interactive. Now you can get a decent picture of a part before you order it. [¶] Go here: http://4FCC.com/return.cfm?remote =http://www.test-x.com. [¶] Please reply with REMOVE to be deleted from our list."

The Internet address in Franklin's May 7 e-mail led the viewer to FCC's Web site; from there, the Test-X Web site could be accessed by a Web link. The FCC Web site displayed logos of FCC's principal vendors. When the Web user clicked on a logo with the browser, the Web user would be led to that vendor's Web site via a Web link. The FCC Web site acted as the host or frame for Web sites accessed via the Web link. "Framing refers to the process whereby one Web site can be visited while remaining in a previous Web site." (*Digital Equipment Corp. v. AltaVista Technology, Inc.* (D.Mass. 1997) 960 F.Supp. 456, 461, fn. 12.)

After receiving Franklin's May 7 e-mail, Axton visited the Test-X Web site by first visiting the FCC Web site and clicking on the Test-X logo. At the Test-X Web site, Axton viewed a catalog of Test-X products. He noticed part of the catalog included parts and part number schemes he believed had been copied from two other companies, Giese International (Giese) and Test Connections, Inc. (TCI). He saw the Giese logo in the catalog on the Test-X Web site.

On May 7, 2001, Axton contacted Ed Shea, TCI's general manager, concerning the FCC Web site. Shea told Axton that "Franklin and Test-X did

not have permission to copy TCI's materials onto their website." Shea also told Axton that Franklin initially had refused to sign a domestic representative agreement with TCI because the agreement included a trade secret clause, and that Franklin had told Shea he " 'didn't believe there were such things as trade secrets.' " Shea visited FCC's Web site and concluded FCC was representing products for Test-X that competed with TCI, in violation of the written contract between FCC and TCI. TCI terminated FCC as its sales representative. An attorney for TCI contacted Test-X's president and demanded Test-X cease posting TCI "proprietary materials."

Axton spoke with Larry Cannedy of Giese. When Cannedy told Axton that Test-X did not represent Giese, Axton responded, "[t]hen I think it is in your best interests to go to this web site and take a look at this." Axton forwarded Franklin's May 7 e-mail to Cannedy. Soon thereafter, FCC received a letter from an attorney representing Giese stating, "Giese International is extremely unhappy about the test-x.com site carrying unauthorized copies of its product pages without ever having obtained or even requested permission to do so." The letter continued, "[e]ach page is an original work of Giese International with content which is new, original, and well exceeds the content threshold necessary for copyright protection."

After viewing the Test-X Web site via the FCC Web site, Axton sent the three e-mails forming the basis for this lawsuit.

*The first e-mail.* Axton's first e-mail was sent to Yorio Hidehira, Micro-Craft's chief executive officer, on May 15, 2001, and read: "I thought you might find this e-mail from Brian [*sic*] Franklin very disturbing. Please follow the path. [] FCC & Test-X stole copyrighted materials from Giese International & Test Connections and placed this data on their websites as their own. Please review the music wire 2.50 inch crimped prints. [T]hey still have Giese's title block on the documents. [¶] It's bad enough that FCC & Test-X violated US copyright laws when they took this data and tried to make it look like their own. [] FCC took Test Connections['] copyrighted materials and plagiarized the data. [] FCC had a legal contract with Test Connections (TCI) and pretended to act as sales agent. [¶] Unfortunately, FCC represents USA MicroCraft in the US market. What makes you believe that he would honor your intellectual properties? DDI has non-disclosure agreements on file with Giese, TCI, MicroCraft, and FCC. [] We take our customers['] and vendors['] intellectual properties very seriously. Now, DDI has been compromised by MicroCraft's US sales agent. DDI does not condone this type of unlawful practices and as such FCC will not be able to participate in any DDI business activity. I am concerned as we are giving MicroCraft, our customer data . . . and FCC has access to this data. Also when this incident becomes public in

the next few days, MicroCraft's relationship with FCC could be misconstrued by DDI's customers and vendors. This is not good and FCC is not a [*sic*] honorable company."

Axton's e-mail prompted an exchange of e-mails between Axton and Hidehira. Hidehira responded to Axton's first e-mail with an e-mail thanking Axton for the information and stating in part: "We take intellectual properties rights very seriously. However currently, I do not know or understand what Bryan Franklin is doing on the website. [¶] Please understand that FCC does represent MicroCraft in the West Coast, however not for DDI account. . . . I will make sure that we keep all information between MicroCraft and DDI."

*The second e-mail.* On May 16, 2001, Axton responded to Hidehira's e-mail by sending him the second e-mail, which read: "Apparently, you misunderstand my intent. [] [¶] a. DDi's customers (and competitors) are being led to believe that FCC has an active role in the DDi/MicroCraft relationship. FCC's profound lack of respect for intellectual properties will reflect poorly on MicroCraft & DDi. [¶] b. FCC is clearly involved in this Test-X web site and this constitutes a breach of the DDi/FCC non-discl[o]sure agreement. DDI will not be conducting business with FCC & Test-X. Mr. Franklin has made comments to myself and others as to his belief that trade secrets are bogus. [] His words. [¶] We respect your position in regards to this issue. Please understand our situation, FCC has seriously undermined DDI's ability to protect our (& our clients['] and vendors[']) intellectual property. Therefore, we will not be forwarding any data to MicroCraft and any ongoing evaluations of MicroCraft products and/or services will be immediately discontinued."

Hidehira responded with an e-mail to Axton announcing, in essence, MicroCraft would end its relationship with FCC. The e-mail stated, in part: "[W]e don't have enough time to investigate all issues, contracts with FCC and legal issues. However I can issue this immediate letter to FCC. [¶] 1. As of May 12, 2001 FCC will stop all communications, interactions, and sales activities between DDI and MicroCraft regarding MicroCraft issues. [¶] 2. As of May 12, 2001 FCC will not receive any compensation with any sales on MicroCraft Products. [¶] 3. FCC will remove the MicroCraft Link from its website immediately. [¶] 4. FCC will not communicate, ask questions, or inquire any information from any MicroCraft employee. [¶] I am prepared to write a letter like this to Bryan Franklin of FCC. This will insure that all DDI customers' information will be safe with MicroCraft." The record contains no evidence such a letter was ever prepared or sent.

*The third e-mail.* On June 4, 2001, Axton received an e-mail from Dave Runyon of FastFixtures, one of FCC's principal vendors, requesting that DDi

consider purchasing a new technology that FastFixtures had developed. In response, Axton sent Runyon the third e-mail stating, in part: "Unfortunately, your product has not been evaluated at this time due to your relationship with FCC. [¶] FCC is not in good standing with DDI due to their intolerance of intellectual properties, copyrights, and trade secrets." Runyon responded with an e-mail to Axton stating, in part: "I do not understand your situation with FCC and neither myself, nor my product should be disqualified on that basis. [¶] I will indeed refrain from any further references to DDI. In fact, I request that you withdraw my product from consideration in any of your facilities. [¶] Your hostile response to my harmless letter has left me with no desire to develop[] a relationship."

Axton did not seek legal advice before sending any of the e-mails. Axton contends that before he sent the first e-mail he called Franklin and left a message saying, "Bryan, you need to call me. I am very concerned about this link." Franklin denied ever receiving this message or any communication from Axton.

After June 11, 2001, Franklin made no effort to sell MicroCraft products, having placed the relationship between MicroCraft and FCC "on hold," despite a request by Adelino Sousa, MicroCraft's president, that Franklin continue sales efforts. Sousa expressed concern that Franklin intended to sue DDi, a MicroCraft customer. On July 8, 2001, Franklin sent an e-mail to Sousa stating: "Please begin your search for a Rep in So. Cal. This is not a resignation however, I may resign due to circumstances." Sousa responded with an e-mail to Franklin stating, in part: "I can no longer keep waiting for FCC's response. I am requesting th[at] you send me a Formal Resignation by Tomorrow Afternoon (6[sic]/17/2001). It is not our intent to look for a new rep at this time. MicroCraft will wait approximately 90 days and then review our sales strategy. We can then discuss a new contract if you wish." Franklin responded to Sousa's e-mail with an e-mail of July 16, 2001, stating: "You know the exact date that I put FCC and MicroCraft on hold. I suggest you wait until DDI responds before you or I decide what we do. The choice is yours. . . . If you choose not to wait and terminate please be my guest."

Franklin resigned from his position as sales representative for MicroCraft, stating in an e-mail dated July 17, 2001, "[t]he relationship that we've had for the last 8+ years has been severed and I find I can no longer work under the current environment/condition."

PROCEDURAL HISTORY

Franklin and FCC sued DDi and Axton, asserting causes of action for (1) libel per se, (2) trade libel, (3) intentional interference with contractual

relationships, (4) intentional interference with prospective economic relation-ships, and (5) violations of Business and Professions Code section 17200 et seq. Franklin and FCC alleged Axton's e-mails were defamatory per se and disrupted or interfered with Franklin and FCC's business relationships with MicroCraft and several other companies in the electronics testing industry.

DDi and Axton moved for summary judgment and, alternatively, for summary adjudication of causes of action. The trial court granted summary judgment. The trial court, in its tentative decision, concluded: "The e-mails are libel as they have a 'tendency to injure him in his occupation.' Here, the e-mails state that plaintiff 'plagiarized[,]' engaged in 'unlawful practices', 'FCC is not an honorable company' and 'FCC is not in good standing with DDI due to [its] intolerance of intellectual properties . . . .' There is no innuendo, defendant clearly believes plaintiff is engaging in unlawful activity. The communications herein are libel on their face."

The trial court also concluded, however, the three e-mails were privileged under Civil Code section 47, subdivision (c) because "[i]n making the comments about plaintiff, defendant was attempting to protect Ddi's product," "MicroCraft would be interested in plaintiff's disrespect for intellectual property because it had plaintiff on payroll and a reputation to maintain," and "Fast Fixtures would be interested in that information as it was attempting to sell defendant its product." The court concluded "plaintiff has not demon-strated any actual malice pursuant [to] *Lundquist* [*v. Reusser* (1994) 7 Cal.4th 1193 [31 Cal.Rptr.2d 776, 875 P.2d 1279]]" and "[t]he content of the communications were [*sic*] based on what defendant Axton thought to be the truth." The court also concluded "[p]laintiff failed to carry the burden as to the 3rd and 4th causes of action."

■ Following a hearing, the trial court entered a minute order adopting its tentative ruling as the final ruling and granting summary judgment. Judgment was entered in favor of DDi and Axton. Franklin and FCC timely appealed. We review summary judgment de novo. (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65, 67–68 [99 Cal.Rptr.2d 316, 5 P.3d 874]; *Village Nurseries v. Greenbaum* (2002) 101 Cal.App.4th 26, 35 [123 Cal.Rptr.2d 555].)

DISCUSSION

I. *Libel Per Se and Trade Libel Causes of Action*

In the first cause of action, Franklin and FCC alleged Axton's three e-mails were libelous on their face. In the second cause of action, Franklin and FCC alleged Axton's three e-mails disparaged Franklin and FCC's services.

■ The relevant law is the same as to libel and trade libel, and the same conditional privileges apply to both causes of action. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010–1011 [113 Cal.Rptr.2d 625]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 576, p. 671.)

"Libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) "Trade libel is the publication of matter disparaging the quality of another's property, which the publisher should recognize is likely to cause pecuniary loss to the owner." (*ComputerXpress, Inc. v. Jackson, supra,* 93 Cal.App.4th at p. 1010.) "The sine qua non of recovery for defamation . . . is the existence of falsehood." (*Letter Carriers v. Austin* (1974) 418 U.S. 264, 283 [41 L.Ed.2d 745, 94 S.Ct. 2770].) A statement is libel on its face if it "is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact." (Civ. Code, § 45a.)

Franklin and FCC contend the three e-mails were actionable as libel and/or trade libel because they contained false statements of fact. DDi and Axton do not deny the three e-mails, if untrue, were libelous on their face, as the trial court concluded. They contend, however, the e-mails were not actionable because the messages merely expressed Axton's opinions and disclosed all the facts supporting those opinions. Franklin and FCC counter that the average reader would not understand the e-mails to disclose the factual bases for Axton's statements.

Our analysis starts with *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87], in which the California Supreme Court strictly distinguished between statements of fact and statements of opinion for purposes of defamation liability. In *Baker*, the court concluded statements of fact may be actionable as libel; statements of opinion are constitutionally protected. (*Ibid.*) However, "[t]his categorical exemption of opinions from the reach of defamation law rested on a passage from *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 339–340 [41 L.Ed.2d 789, 94 S.Ct. 2997]," and "[t]he viability of this categorical 'opinion rule' was considered in *Milkovich*[, *supra,* 497 U.S. 1, 18–19]." (*Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1606 [284 Cal.Rptr. 244].)

In *Milkovich, supra,* 497 U.S. 1, the United States Supreme Court rejected the contention that statements of opinion enjoy blanket constitutional protection. The Supreme Court reasoned that "[s]imply couching such statements in terms of opinion does not dispel these [false, defamatory] implications" (*id.* at p. 19) because a speaker may still imply "a knowledge of facts which lead

to the [defamatory] conclusion" (*id.* at p. 18). The court explained that expressions of opinion may imply an assertion of objective fact. For example, "[i]f a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." (*Id.* at pp. 18–19.) Statements of opinion that imply a false assertion of fact are actionable. (*Id.* at p. 19.)

Thus, after *Milkovich*, the question is not strictly whether the published statement is fact or opinion. Rather, the dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact. (*Milkovich, supra,* 497 U.S. at p. 19; see also *Standing Committee, supra,* 55 F.3d 1430, 1438–1439; *Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1383 [88 Cal.Rptr.2d 802]; *Kahn v. Bower, supra,* 232 Cal.App.3d at p. 1607; *Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 724 [275 Cal.Rptr. 494].) *Milkovich* did not change the rule that satirical, hyperbolic, imaginative, or figurative statements are protected because "the context and tenor of the statements negate the impression that the author seriously is maintaining an assertion of actual fact." (*Weller v. American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 1000–1001 [283 Cal.Rptr. 644].)

■ Whether a statement declares or implies a provably false assertion of fact is a question of law for the court to decide (*Eisenberg v. Alameda Newspapers, Inc., supra,* 74 Cal.App.4th at p. 1382; *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 837 [52 Cal.Rptr.2d 831]), unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood (*Kahn v. Bower, supra,* 232 Cal.App.3d at p. 1608; *Weller v. American Broadcasting Companies, Inc., supra,* 232 Cal.App.3d at p. 1001, fn. 8).

■ In determining whether a statement is actionable fact or nonactionable opinion, *Baker* instructed courts to use a " 'totality of the circumstances' " test. (*Baker v. Los Angeles HeraldExaminer, supra,* 42 Cal.3d at p. 260.) After *Milkovich*, the same totality of the circumstances test is used to determine whether the statement in question communicates or implies a provably false statement of fact. (*Kahn v. Bower, supra,* 232 Cal.App.3d at p. 1608.) Under the totality of the circumstances test, "[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered." (*Baker v. Los Angeles Herald*

*Examiner, supra,* 42 Cal.3d at pp. 260–261.) "*Milkovich* did not substantially change these principles." (*Moyer v. Amador Valley J. Union High School Dist., supra,* 225 Cal.App.3d at p. 724.)

Applying the totality of the circumstances test, we conclude Axton's first and second e-mails are best characterized as Axton's protected opinions that Franklin and FCC stole copyrighted material, plagiarized data, breached a nondisclosure agreement with DDi, compromised DDi, and were dishonorable. In reaching this conclusion, we are persuaded by the analysis of *Coastal Abstract Service, Inc. v. First American Title Ins. Co.* (9th Cir. 1999) 173 F.3d 725 (*Coastal Abstract*) and *Standing Committee, supra,* 55 F.3d 1430.

In *Coastal Abstract, supra,* 173 F.3d 725, 729, an officer of the defendant title insurance company stated the plaintiff, an escrow company, "was not licensed in California" to engage in the escrow business. The Ninth Circuit Court of Appeals held that statement was not actionable as a matter of law because it expressed an opinion based upon fact. "Thus the statement that Coastal was operating illegally without a California license might present a triable claim if in fact Coastal had a California license. There is no dispute, however, that Coastal had no California license (and was not affiliated with a California licensee) at the time First American made the statement. The only claim of falsity concerns the statement or suggestion that California's statute applied to the activities of Coastal, which was (and apparently still is) a matter of opinion." (*Id.* at p. 732.)

In *Standing Committee, supra,* 55 F.3d 1430, an opinion authored by Judge Kozinski, the Ninth Circuit Court of Appeals considered the propriety of the district court's disciplinary action against Attorney Stephen Yagman for making several statements about District Judge Keller. In one statement, Yagman said Judge Keller " 'has a penchant for sanctioning Jewish lawyers: me, David Kenner and Hugh Manes. I find this to be evidence of anti-semitism.' " (*Id.* at p. 1438.) The Ninth Circuit concluded the first part of the statement was fact, and was true—Kenner, Manes, and Yagman were all Jewish attorneys, and Judge Keller sanctioned them. (*Ibid.*) The Ninth Circuit characterized the statement " 'I find this to be evidence of anti-semitism' " as opinion because it conveyed Yagman's personal belief that Judge Keller is anti-semitic. (*Ibid.*) Because part of the statement was opinion, "it may be the basis for sanctions only if it could reasonably be understood as declaring or implying actual facts capable of being proved true or false." (*Id.* at pp. 1438–1439.)

The Ninth Circuit, using examples from section 566 of the Restatement Second of Torts, contrasted opinion statements based upon expressly stated facts with opinion statements based on implied, undisclosed facts. (*Standing*

*Committee, supra,* 55 F.3d at p. 1439.) "The statement, 'I think Jones is an alcoholic,' for example, is an expression of opinion based on implied facts, [citation], because the statement 'gives rise to the inference that there are undisclosed facts that justify the forming of the opinion,' [citation]. Readers of this statement will reasonably understand the author to be implying he knows facts supporting his view—*e.g.,* that Jones stops at a bar every night after work and has three martinis. If the speaker has no such factual basis for his assertion, the statement is actionable, even though phrased in terms of the author's personal belief." (*Ibid.*)

The Ninth Circuit provided this example from section 566 of the Restatement Second of Torts of an opinion based on expressly stated facts: " '[Jones] moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair . . . with a drink in his hand. I think he must be an alcoholic.' [Citation.]" (*Standing Committee, supra,* 55 F.3d at p. 1439.) This opinion disclosed all the facts on which it was based and did not imply there are other, unstated facts supporting the belief Jones is an alcoholic. The opinion that Jones " 'must be an alcoholic' " is actionable only if the disclosed facts are false and defamatory. "A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning." (*Ibid.*) The rationale for this rule is that "[w]hen the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts." (*Ibid.*) When the facts supporting an opinion are disclosed, "readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts." (*Ibid.*; see also *Partington v. Bugliosi* (9th Cir. 1995) 56 F.3d 1147, 1156–1157 ["when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment"]; *Chapin v. Knight-Ridder, Inc.* (4th Cir. 1992) 993 F.2d 1087, 1093 ["[b]ecause the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related"]; *Phantom Touring, Inc. v. Affiliated Publications* (1st Cir. 1992) 953 F.2d 724, 730 [if author discloses basis for statement, it can only be read as the author's "personal conclusion about the information presented, not as a statement of fact"].)

Axton's statements in the first and second e-mails that FCC stole copyrighted material and plagiarized data are similar to the comment in *Coastal Abstract, supra,* 173 F.3d 725 that Coastal was operating illegally without a license. Axton's statements purported to interpret copyright law and contract law and apply that law to fully disclosed facts—the FCC Web site and its link

to the Test-X Web site—to conclude Franklin and FCC engaged in unlawful conduct. Axton's comments similarly are opinion even if construed as accusing Franklin of criminal activity. "Accusations of criminal activity, like other statements, are not actionable if the underlying facts are disclosed." *(Nicosia v. De Rooy* (N.D.Cal. 1999) 72 F.Supp.2d 1093, 1103.)

The first and second e-mails disclosed the facts on which Axton's opinions were based and did not imply the existence of any other facts on which the opinions were based. The first e-mail enclosed Franklin's e-mail and invited the reader to "follow the path" leading to the FCC and Test-X Web sites. The first e-mail then invited the reader to "review the music wire 2.50 inch crimped prints" and described the prints as having Giese's "title block" on them. The first e-mail thus disclosed Franklin's e-mail, the FCC Web site, the Test-X Web site, and the prints found on the Test-X Web site as the bases for the opinions stated.

Franklin and FCC argue in their reply letter brief the average reader of the first e-mail would not understand the e-mail fully disclosed the basis for Axton's opinions. A reasonable reader, Franklin and FCC argue, "would not be able to discern that the link [from] the FCC website to the Test-X website was the basis for the defamatory statements in Axton's e-mails to Micro-Craft." We disagree. The first e-mail identified the link to the FCC Web site and the link to the Test-X Web site and neither the first e-mail nor the second e-mail expressed or implied any other factual basis for the opinions. Although the process of accessing the factual bases for the opinions involved clicking onto each Web site, the dispositive point is those factual bases were disclosed and were accessible to the reader.

The facts upon which Axton's opinions were based were provably true because the existence, content, and layout of the Web sites were not in dispute in any material way. Because we are not determining the truth or reasonableness of Axton's opinions, the issue in determining whether the Web sites were provably true is not whether the Web sites made truthful assertions of fact, but whether the Web sites in fact existed and made the assertions claimed. Franklin's e-mail, the FCC Web site, and the Test-X Web site existed, and the parties agree on their layout and content. Although the parties dispute the type size of the Giese logo on the Test-X Web site, they do not in any other respect dispute the layout or content of the Web sites or of Franklin's e-mail. It is undeniable the FCC Web site frames the Test-X Web site when the Web site links are used.

The first two e-mails expressed Axton's opinions about the Web sites. The reader, Hidehira, was invited to view the Web sites. He was "free to accept or reject the author's opinion based on [his] own independent evaluation of the

facts" (*Standing Committee, supra,* 55 F.3d at p. 1439) and " 'free to form another, perhaps contradictory opinion from the same facts' " (*id.* at p. 1440). Finally, the statement in the first e-mail that FCC is not an "honorable company" and the statement in the second e-mail that FCC displayed a "profound lack of respect for intellectual properties" are classic assertions of subjective judgment.

In determining whether the first two e-mails implied a provably false factual assertion, we must also consider the context in which the e-mails were made. (*Baker v. Los Angeles Herald Examiner, supra,* 42 Cal.3d at pp. 260–261; *Moyer v. Amador Valley J. Union High School Dist., supra,* 225 Cal.App.3d at pp. 724–725.) "This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed." (*Baker v. Los Angeles Herald Examiner, supra,* 42 Cal.3d at p. 261.) The circumstances in which the e-mails were prepared, sent, and understood support our conclusion the e-mails contained protected statements. Axton received Franklin's e-mail, reviewed the FCC Web site, and formed the opinions expressed in the e-mails. These circumstances support the conclusion Axton's opinions in the first and second e-mails were based only upon the Web sites.

Axton is not, and did not purport to be, an attorney. The average reader therefore would not have assumed the statements in the first and second e-mails had the weight of a legal opinion. Although Axton did not temper his opinions with words of transparency, neither did he present his opinions as legal truths framed in legal verbiage. Indeed, his statements that Franklin "stole" copyrighted material, "compromised" DDi, and "plagiarized" data appear in context as rhetorical hyperbole. (*Moyer v. Amador Valley J. Union High School Dist., supra,* 225 Cal.App.3d at p. 726; see also *Letter Carriers v. Austin, supra,* 418 U.S. at p. 283 [" 'traitor[s]' " understood to mean that plaintiffs' actions were reprehensible, not that plaintiffs had committed treason]; *Greenbelt Coop. Pub. Assn. v. Bresler* (1970) 398 U.S. 6, 13–14 [26 L.Ed.2d 6, 90 S.Ct. 1537] [" 'blackmail' " a vigorous epithet used to describe unreasonable negotiations]; *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 278–279, 105 Cal.Rptr.2d 674 [calling plaintiff "thief" and "liar" during political campaign was hyperbole]; *Morningstar, Inc. v. Superior Court* (1994) 23 Cal.App.4th 676, 687–694 [29 Cal.Rptr.2d 547] [title stating " 'Lies, Damn Lies, and Fund Advertisements' " held not to imply money management fund actually lied].)

As Franklin and FCC point out, Hidehira was a Japanese national and professed to a lack of understanding of American law, but those facts do not

suggest the first two e-mails implied a provably false factual assertion.[1] The specific understanding of Hidehira—the only and therefore "average reader" of the two e-mails to MicroCraft—supports the conclusion the e-mails adequately disclosed the factual basis for the opinions expressed. Hidehira, given his position, understood Internet matters, including such concepts as framing and Web links, and could navigate the path to the FCC Web site and the Test-X Web site.

The third e-mail, to Dave Runyon of FastFixtures, is an easier call. The e-mail was not actionable. Axton's statements "your product has not been evaluated at this time due to your relationship with FCC" and "FCC is not in good standing with DDI" were true. Axton's statement that FCC was "intoleran[t] of intellectual properties, copyrights, and trade secrets" was too vague to be actionable. (*Moyer v. Amador Valley J. Union High School Dist.,* *supra,* 225 Cal.App.3d at pp. 725–726; see also *Chapin v. Knight-Ridder,* *Inc., supra,* 993 F.2d at p. 1093 [" 'Hefty' is just too subjective a word to be proved false"].)

Our conclusion that Axton's e-mails conveyed protected statements properly balances, we believe, the First Amendment guarantee of free speech and society's " 'pervasive and strong interest in preventing and redressing attacks upon reputation.' " (*Milkovich, supra,* 497 U.S. at p. 22.) Franklin's natural and compensable interest in his and FCC's reputation was protected because the first and second e-mails disclosed the factual basis for Axton's opinions. The reader could access the FCC Web site and link to the Test-X Web site, and based upon those Web sites could decide whether to accept or reject Axton's opinions.

Because we conclude the three e-mails sent by Axton were not actionable as libel or trade libel, we do not reach the issue whether the e-mails were privileged under Civil Code section 47, subdivision (c).

[1] Axton and DDi argue Hidehira's nationality and lack of understanding of American law should not be considered because the test for whether a statement is fact or opinion is an objective test. (*Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1404 [88 Cal.Rptr.2d 843] ["when analyzing the statements in question, courts do so from the perspective of the average reader, not a person trained in the technicalities of the law"].) But in analyzing the context in which the statements were made, courts must look to "the knowledge and understanding of the audience to whom the publication was directed" (*Baker v. Los Angeles Herald Examiner,* *supra,* 42 Cal.3d at p. 261) and measure the effect of a publication by its " 'natural and probable effect upon the mind of the average *reader*' " (*Morningstar, Inc. v. Superior Court,* *supra,* 23 Cal.App.4th at p. 688, italics added). Here, the audience to whom the first two e-mails were directed was Hidehira.

## II. *Interference with Contractual Relations and Interference with Prospective Economic Relationships Causes of Action*

In the third and fourth causes of action, Franklin and FCC alleged Axton's e-mails interfered with Franklin and FCC's existing contracts and future economic relationships with MicroCraft and several other companies. We conclude Franklin and FCC failed to show a triable issue regarding causation.

 A cause of action for interference with contractual relations and a cause of action for interference with prospective economic relations both require the plaintiff to prove causation. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587] [interference with contract]; *PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 595 [52 Cal.Rptr.2d 877] [interference with prospective economic relations].) "A cause of injury, damage, loss or harm is something that is a substantial factor in bringing about an injury, damage, loss or harm." (BAJI No. 3.76; see also *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052–1053 [1 Cal.Rptr.2d 913, 819 P.2d 872].)

First, we address Franklin and FCC's allegation Axton's e-mails interfered with contracts and economic relationships other than those with MicroCraft. In support of the motion for summary judgment, DDi and Axton presented declarations showing FCC lost no business with companies other than MicroCraft as a result of Axton's e-mails. Franklin and FCC produced no evidence in opposition. Franklin and FCC conceded this point in their separate statement, stating: "While Plaintiffs[] may not have written evidence of Defendants' interference with any companies other than MicroCraft and Fast Fixtures, these e-mails indicate that Defendants did, in fact, interfere with Plaintiffs' relationships." However, Axton's e-mails alone do not raise an inference of causation sufficient to defeat summary judgment. Franklin and FCC produced no evidence of interference with their relationship with FastFixtures. The exchange of e-mails between Axton and Runyon actually showed Axton's e-mails disrupted or destroyed *DDi*'s relationship with FastFixtures. Franklin and FCC do not contend otherwise on appeal, but argue only that they produced evidence creating a triable issue of fact as to interference with their relationship with MicroCraft.

Second, with respect to Franklin and FCC's relationship with MicroCraft, DDi and Axton submitted in support of the motion for summary judgment the declaration of Adelino Sousa, who stated: "Nothing that DDI or Jim Axton did had anything to do with the end of Mr. Franklin's role as a Microcraft sales representative. Mr. Franklin failed to perform his responsibilities as a Microcraft sales representative and was damaging Microcraft's relationship

with DDI with his threat to initiate litigation against DDI. Mr. Axton and DDI did not interfere with the relationship between FCC and Franklin on the one hand, and MicroCraft on the other. Nothing Mr. Axton or DDI has said or done has in any way affected my opinion of Mr. Franklin or FCC." According to Sousa, MicroCraft has made no commissionable sales to DDi since July 2001, when Franklin ceased being a MicroCraft sales representative. Sousa testified in his deposition that Axton's e-mails did not influence MicroCraft's relationship with FCC. Sousa was concerned when Franklin threatened to sue DDi because "[a]s a vendor, if customers fear that you are going to sue them, they are not going to want to do business with you."

DDi also submitted portions of Franklin's deposition transcript in support of the motion for summary judgment. Franklin testified Sousa asked him to continue to sell MicroCraft products after June 11, 2001, but Franklin placed the relationship "on hold."

This evidence was sufficient to meet DDi's initial burden of production to make a prima facie showing that there was not a triable issue of material fact on the issues of interference and of causation of damages. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) The burden shifted to Franklin and FCC to show the existence of a triable issue regarding whether Axton's e-mails were a substantial factor in bringing about injury or damage. Franklin and FCC, in their separate statement in opposition to the summary judgment motion, identified the July 2001 exchange of e-mails between Franklin and Sousa as creating a triable issue as to causation. FCC and Franklin also relied upon Hidehira's May 16, 2001 e-mail to Axton and Franklin's declaration as creating a triable issue.[2] We analyze this evidence.

First, the exchange of e-mails between Sousa and Franklin did not create a triable issue of fact regarding causation. On July 8, 2001, Franklin sent an e-mail to Sousa stating: "Please begin your search for a Rep in So. Cal. This is not a resignation however, I may resign due to circumstances." Sousa responded with an e-mail to Franklin stating, in part: "I can no longer keep waiting for FCC's response. I am requesting th[at] you send me a Formal Resignation by Tomorrow Afternoon (6[*sic*]/17/2001). It is not our intent to look for a new rep at this time. MicroCraft will wait approximately 90 days and then review our sales strategy. We can then discuss a new contract if you

---

[2] Franklin and FCC do not contend Axton's e-mails to Hidehira create a triable issue as to causation. Indeed, while Axton's e-mails constitute evidence of acts intended to induce a breach or disruption of a contractual relationship, Axton's e-mails alone do not support a reasonable inference of causation of damages.

wish." Franklin responded to Sousa's e-mail with an e-mail of July 16, 2001, stating: "You know the exact date that I put FCC and MicroCraft on hold. I suggest you wait until DDI responds before you or I decide what we do. The choice is yours. . . . If you choose not to wait and terminate please be my guest."

We construe these e-mails favorably to Franklin and FCC as establishing MicroCraft did ask for Franklin to resign as a sales representative. Nonetheless, the e-mails do not reveal a causal nexus between Axton's e-mails and MicroCraft's request for Franklin's resignation. The e-mails do not contradict Sousa's declaration that Axton's e-mails had nothing to do with the end of Franklin's role as a Microcraft sales representative. The e-mails do not, therefore, tend to show Axton's e-mails were a substantial factor in bringing about MicroCraft's request for Franklin's resignation.

Second, Hidehira, in his May 16, 2001 e-mail to Axton, stated he was prepared to send Franklin a letter announcing MicroCraft would cease all communications and business activities with FCC. The record contains no evidence, however, that such a letter was ever sent. To the contrary, Franklin testified that in June 2001 Sousa encouraged him to continue selling Micro-Craft products and Franklin placed the relationship between MicroCraft and FCC on hold.

Finally, Franklin's declaration failed to create a triable issue of fact regarding causation. Franklin declared: "Prior to the e-mails that form the basis of the instant action, FCC had always been a profitable company making in excess of $100,000 every year it was in business, a large portion of which was derived from MicroCraft sales. [¶] . . . [¶] . . . Almost immediately upon receipt of Defendant Axton's e-mails, MicroCraft severely limited its relationship with Plaintiffs and subsequently specifically requested that Plaintiffs cease doing business with MicroCraft[.] [¶] . . . Immediately following the libelous e-mails from Defendants, Plaintiffs' sales dropped dramatically and, therefore, so did the commission payments Plaintiffs were entitled to. In addition, subsequent to the e-mails at issue, Plaintiffs lost many of their principals and clients."

Franklin's declaration does not set forth a causal nexus between Axton's e-mails and FCC's loss of business. Rather, the declaration attempts to establish causation through a temporal sequence: Because the e-mails preceded FCC's loss of MicroCraft's business, the e-mails caused the loss. A

cause and effect relationship based upon such a temporal sequence is a classic example of the logical fallacy of post hoc, ergo propter hoc (literally, "after this, therefore because of this"). (See *Bland v. Southern Pac. R. Co.* (1884) 65 Cal. 626, 628 [4 P. 672]; *People v. Abraham* (1986) 185 Cal.App.3d 1221, 1231 [230 Cal.Rptr. 325] (conc. opn. of Poché, J.); *Huskey v. City of San Jose* (9th Cir. 2000) 204 F.3d 893, 899; *Choe v. I.N.S.* (9th Cir. 1993) 11 F.3d 925, 938 (conc. & dis. opn. of Alarcon, J.).) With respect to causation, "[m]ore than *post hoc, ergo propter hoc* must be demonstrated." (*Motorola Communication & Electronics, Inc. v. Department of General Services* (1997) 55 Cal.App.4th 1340, 1345 [64 Cal.Rptr.2d 477]; see also *Hardt v. Heidweyer* (1894) 152 U.S. 547, 558 [38 L.Ed. 548, 14 S.Ct. 671].) Thus, "it is a false generalization to suppose that because a sinking follows a collision thirty-nine days later, the sinking necessarily was an effect of the collision." (*Dreijer v. Girod Motor Co.* (5th Cir. 1961) 294 F.2d 549, 555.)

■ Similarly, it is a false generalization to infer that because FCC lost MicroCraft's business after Axton's e-mails, the loss of business necessarily was an effect of the e-mails. Put another way, a trier of fact could not draw a reasonable inference that Axton's e-mails to Hidehira were a substantial factor in bringing about FCC's lost business merely because the e-mails preceded the loss. Franklin's declaration, as the other evidence Franklin and FCC relied upon to show causation, failed to present a causal nexus between Axton's e-mails and Franklin and FCC's loss of business from MicroCraft sufficient to create a triable issue of fact.

Franklin and FCC failed to meet their burden of producing evidence showing the existence of a triable issue of fact as to causation of damages; therefore, we affirm summary adjudication of the causes of action for interference with contractual relations and interference with prospective economic relations.

### III. *Cause of Action Under Business and Professions Code Section 17200*

Franklin and FCC concede the fifth cause of action for violations of Business and Professions Code section 17200 is dependent upon the other causes of action. Because the first four causes of action were properly adjudicated against Franklin and FCC, the fifth cause of action was properly adjudicated against them as well.

## Disposition

The judgment is affirmed. Respondents to recover costs incurred on appeal.

Moore, Acting P. J., and Ikola, J., concurred.