Filed 4/25/13  Hodge v. East Bay Express CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MARCIE HODGE,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>EAST BAY EXPRESS ET AL.<br><br>　　　　Defendants and Respondents. | A134090<br><br>(Alameda County<br>Super. Ct. No. RG10540126) |

Marcie Hodge (appellant) brought an action for defamation against the East Bay Express (the Express), a weekly news publication; Robert Gammon, the writer of an Express column called "Full Disclosure"; and Stephen Buel, the Express's then editor (collectively respondents).  The trial court granted respondents' special motion to strike the complaint, pursuant to the provisions of California's anti-strategic lawsuit against public participation (anti-SLAPP) statute (Code Civ. Proc., § 425.16).[1]  Appellant now appeals, contending she showed a probability of prevailing on the merits and that, therefore, the court erred in granting the anti-SLAPP motion and dismissing her complaint.  We shall affirm the judgment.

***BACKGROUND***

In 2010, appellant, who had previously been elected to two terms as a trustee of the Peralta Community College Peralta District (district), was a candidate for mayor of Oakland.  On September 29, 2010, the Express published a "Full Disclosure" column

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

written by Gammon, entitled *The Baffling Mayoral Bid of Marcie Hodge*.  The column discussed appellant's political background as a Peralta board trustee, her prior unsuccessful run for Oakland City Council, as well as her 2010 campaign for mayor, and raised questions regarding whether she was running for mayor as a favor to veteran politician and fellow-candidate for mayor, Don Perata, who, Gammon suggested, was supporting her campaign in an effort to siphon off African-American votes from other, more viable mayoral candidates.

On October 5, 2010, appellant filed a complaint for damages against respondents.  The complaint included a single cause of action for defamation.  Appellant alleged in the complaint that the following statements in Gammon's column were false and defamatory:[2]

"Former state senator Don Perata helped her run for Oakland City Council in 2006.  Is her run for mayor in 2010 designed to return the favor?

"When Marcie Hodge ran for Oakland City Council against Desley Brooks four years ago, it was no secret who was behind her campaign.  Brooks and Don Perata had clashed often over the years, and the then-state senator's close ally, Councilman Ignacio De La Fuente, made it clear at the time that he wanted Brooks out of office.  So they found a candidate to take on Brooks—political neophyte Marcie Hodge.

"[¶]  In 2008, Hodge ran for an open seat on the Peralta Community College Board of Trustees. . . .

"However, her short tenure on the Peralta board has been plagued with scandal.  She used the district's credit card for personal expenses at a time when Peralta was facing financial insolvency, forcing her board colleagues to publicly admonish her.

"[¶] . . . [¶]  So where did she get all that cash and why is she spending so much of it when she won't take the time to prepare for a debate? . . .

---

[2] We have corrected some minor inaccuracies in the complaint's quotations from the column, using the print version of the column as our guide.  Also, when quoting from the column, we will omit the bolding of words that were written in bold in the original column.

"[¶] . . . [¶]  Hodge also seems to be mostly targeting black voters.  Her radio ads have run on stations that are popular with black listeners, and her billboards are in predominantly black neighborhoods.  So if her campaign is not about taking votes away from [candidates Rebecca] Kaplan and [Jean] Quan, why would she target the black vote in a race when blacks make up about a third of the electorate and she will need support from throughout the city?"

On June 2, 2011, respondents filed an anti-SLAPP motion and, on November 17, 2011, the trial court granted the motion and dismissed appellant's complaint with prejudice.[3]

In granting respondents' anti-SLAPP motion, the trial court found that appellant had failed to substantiate a legally sufficient claim for defamation in that, "[c]onsidered in the 'totality of the circumstances' of the full context of the Column and the political campaign in which the challenged statements were made, defendants' challenged statements are all statements of protected opinion under the First Amendment, rather than assertions of 'provably false' fact."  The court also found that the statements regarding the investigation of appellant's credit card use and her colleague's admonition of her were absolutely privileged as fair reports under Civil Code section 47, subdivision (d), and that the statements quoting third persons were privileged under the "neutral reportage" privilege of the First Amendment.  The court further found that appellant had failed to submit prima facie evidence showing that any statement challenged in her complaint was false and that she had not submitted prima facie evidence showing either that respondents acted with actual malice or that she had made a timely demand for a retraction under Civil Code section 48a.

On December 11, 2011, appellant filed a notice of appeal.

---

[3] Respondents also filed a demurrer, which the trial court subsequently "dropped . . . as moot" in light of its grant of the anti-SLAPP motion.

3

## DISCUSSION

### I. *The Anti-SLAPP Statute and Standard of Review*

Subdivision (b)(1) of section 425.16 provides that a "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Subdivision (e) of section 425.16 elaborates the types of acts within the purview of the anti-SLAPP law, including, as relevant here, "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." (§ 425.16, subd. (e)(3).)

"A two step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the facts underlying the plaintiff's complaint fits one of the categories spelled out in section 426.16, subdivision (e). If the court finds that such a showing has been made, it must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 463 (*Hecimovich*), citing *Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

" 'The Legislature enacted section 425.16 to prevent and deter "lawsuits [SLAPPs] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances." (§ 425.16, subd. (a).) Because these meritless lawsuits seek to deplete "the defendant's energy" and drain "his or her resources" [citation], the Legislature sought " 'to prevent SLAPPs by ending them early and without great cost to the SLAPP target' " [citation]. Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation.' [Citation.]" (*Hecimovich*, *supra*, 203 Cal.App.4th at p. 463, quoting *Varian Medical Systems, Inc. v.*

*Delfino* (2005) 35 Cal.4th 180, 192.) Finally, subdivision (a) of section 425.16 expressly mandates that the statute "shall be construed broadly."

We review the trial court's ruling on an anti-SLAPP motion de novo. (*Hecimovich*, *supra*, 203 Cal.App.4th at p. 464.)

## II. *Whether the Cause of Action Arises from Protected Activity*

Appellant did not claim in the trial court, and does not claim now, that respondents failed to satisfy their burden under the first prong of the section 425.16 analysis. The sole cause of action in appellant's lawsuit alleges that Gammon's Express column about the then-upcoming Oakland mayoral election was defamatory. With respect to whether appellant's action is one arising from protected activity, numerous courts of appeal have confirmed that " ' [t]he favored causes of action in SLAPP suits [include] defamation . . . .' " (*Gallimore v. State Farm Fire & Casualty Ins. Co* (2002) 102 Cal.App.4th 1388, 1400, fn. 9; accord, *Hecimovich*, *supra*, 203 Cal.App.4th at p. 464 [citing cases].) Moreover, respondents have shown that the column in the Express involved an issue of "public interest," which is " ' "*any issue in which the public is interested.*" ' [Citation.]" (*Hecimovich*, at p. 465.) We have no doubt that the public in Oakland and beyond would be interested in questions regarding the motives of a candidate who is running for mayor.

We therefore conclude that respondents have shown that the lawsuit arises from a protected free speech activity involving an issue of public interest. (See § 425.16, subd. (e)(3); *Hecimovich*, *supra*, 203 Cal.App.4th at p. 464.)

## III. *The Probability of Prevailing on the Merits*

Appellant contends she submitted sufficient admissible evidence in opposition to respondents' anti-SLAPP motion to satisfy her burden of establishing a probability of prevailing on the merits in her defamation action, under the second prong of the section 425.16 analysis. (See *Hecimovich*, *supra*, 203 Cal.App.4th at p. 468.)

In determining whether a plaintiff has established a probability of prevailing on the merits, we "consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) "Looking at those affidavits, '[w]e do not weigh credibility, nor do we evaluate the weight of the

5

evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law.' [Citation.] [¶] That is the setting in which we determine whether plaintiff has met the required showing, a showing that is 'not high.' [Citation.]" (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 989.)

Although the burden is not high, the plaintiff still must demonstrate that his or her claim is legally sufficient. (*Navellier*, *supra*, 29 Cal.4th at p. 93.) The plaintiff, moreover, must show that the claim "is supported by a sufficient prima facie showing, one made with 'competent and admissible evidence.' [Citations.]" (*Hecimovich*, *supra*, 203 Cal.App.4th at p. 469.)

We will now consider whether appellant has established a probability of prevailing on the merits of her defamation claim.

### A. *The Law of Defamation*

Defamation in the form of libel "is a false and unprivileged publication by writing, . . . which exposes any person to hatred, contempt, ridicule, or obloquy, . . . or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) In deciding if a published statement is defamatory, the "question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact." (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 (*Franklin*).)

Statements phrased as opinions no longer receive blanket constitutional protection. (*Milkovich v. Lorrain Journal Co.* (1990) 497 U.S. 1 (*Milkovich*).) As the Fourth District Court of Appeal explained in *Franklin, supra,* 116 Cal.App.4th at pages 384-385, the Supreme Court in *Milkovich* "reasoned that '[s]imply couching such statements in terms of opinion does not dispel these [false, defamatory] implications' [citation] because a speaker may still imply 'a knowledge of facts which lead to the [defamatory] conclusion' [citation]. . . . Statements of opinion that imply a false assertion of fact are actionable. [Citation.]" (*Franklin*, at pp. 384-385.) Accordingly, after *Milkovich*, the question is not merely whether the statements are fact or opinion, but "whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of

6

fact.  [Citation.]"  (*Franklin*, at p. 385; accord, *Hawran v. Hixon* (2012) 209 Cal.App.4th 256, 289 [same]; Rest.2d Torts, § 566 ["A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion"].)

A comment to section 566 of the Restatement Second of Torts further explains: "A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is.  But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently."  (Rest.2d Torts, § 566, com. c.)  "The rationale behind this rule is straightforward:  When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts.  [Citations.] Moreover, 'an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea'; readers are free to accept or reject the author's opinion based on their independent evaluation of the facts.  [Citations.]" (*Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1439; accord, *Franklin*, *supra*, 116 Cal.App.4th at p. 387 [citing *Standing Committee v. Yagman*]; *Partington v. Bugliosi* (9th Cir. 1995) 56 F.3d 1147, 1156-1157, cited in *Franklin*, at p. 387 ["when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment"].)

To determine whether a statement either declares or implies a provably false assertion of fact, "courts apply the totality of the circumstances test.  [Citation.]  'Under the totality of the circumstances test, "[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . .  [¶] Next, the context in which the statement was made must be considered." ' [Citations.]

Whether a challenged statement 'declares or implies a provable false assertion of fact is a question of law for the court to decide [citations], unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood.' [Citation.]" (*Overhill Farms, Inc. v. Lopez* (2010) 190 Cal.App.4th 1248, 1261.)

To succeed on a defamation claim, a public figure must demonstrate not only the falsity of the challenged statement, but also that the defendant acted with actual malice. (*Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858, 867.) "To show actual malice, a public figure must demonstrate the defendant uttered the statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.' [Citations.] A public figure plaintiff must prove actual malice by clear and convincing evidence. [Citation.]" (*Id*. at pp. 867-868)

### B. *Appellant did Not Establish a Probability of Prevailing on the Merits of Her Defamation Action*

In her complaint, appellant described the challenged statements in Gammon's column as falsely accusing her "of running for Mayor to repay a favor" and falsely claiming "that her campaign targeted only black voters for the purpose of taking votes away from other Mayoral candidates and to help a single candidate to win."

Only if appellant can establish a prima facie case that Gammon either stated or implied provably false assertions of fact in the course of offering his opinion is Gammon's opinion actionable as defamation. (See *Hawran v. Hixson*, *supra*, 209 Cal.App.4th at p. 289; see also *Hecimovich*, *supra*, 203 Cal.App.4th at p. 469.)

In the column, Gammon wrote that Perata and Ignacio De La Fuente had supported appellant's 2006 City Council run, and then hypothesized that appellant was now running for mayor to help split the vote for Perata.[4] In a declaration submitted in

---

[4] As previously set forth, Gammon wrote: "Former state senator Don Perata helped her run for Oakland City Council in 2006. Is her run for mayor in 2010 designed to return the favor?

support of her opposition to the anti-SLAPP motion, appellant stated that she has had no communication whatsoever with Perata other than meeting him at a mayoral candidates' forum in September 2010, that he had no involvement in any of her campaigns, that he did not endorse or support her 2006 candidacy for City Council and had no involvement in her candidacy for mayor, and that she did not have any kind of connection to him. She stated that neither Perata nor De La Fuente "found" her or were behind any of her runs for office, including her City Council run. She also stated, however, that De La Fuente endorsed her for City Council in 2006 and hosted her first fundraiser in that race. In another declaration, Yvonne Hodge, appellant's mother and treasurer of her campaigns for City Council and mayor, stated that appellant never had any dealings with Perata and that Perata never supported, endorsed, or helped appellant in any of her campaigns.

In a declaration in support of respondents' anti-SLAPP motion, Gammon stated: "When I wrote in the Column that 'when Marcie Hodge ran for Oakland City Council against Desley Brooks four years ago, it was no secret who was behind her campaign,' and that Perata and De La Fuente 'found a candidate to take on Brooks,' I intended to convey only that Perata had supported Hodge's candidacy, not that Perata had induced Hodge to run for the office in the first place. In any event, I did not intend to convey to readers that I had any knowledge of Hodge's state of mind or knew specific facts concerning her relationship with Perata or De La Fuente (from 2006 to the present), other than the facts he [*sic*] specifically set forth in the Column. My intention was to set forth the facts I considered relevant to enabling readers to draw their own conclusions as to whether Hodge was consciously running as a 'spoiler.' "

As we shall discuss in greater detail below, looking at the totality of the circumstances, we conclude that the statements in Gammon's column that Perata was

---

"When Marcie Hodge ran for Oakland City Council against Desley Brooks four years ago, it was no secret who was behind her campaign. Brooks and Don Perata had clashed often over the years, and the then-state senator's close ally, Councilman Ignacio De La Fuente, made it clear at the time that he wanted Brooks out of office. So they found a candidate to take on Brooks—political neophyte Marcie Hodge."

"behind" appellant's 2006 City Council run and suggesting that appellant was running as a spoiler in the 2010 mayoral election constitute protected opinion. The statements were based on disclosed facts, which appellant has not shown to be false and which allowed readers to decide if they shared Gammon's interpretation of those facts. (See *Overhill Farms, Inc. v. Lopez*, *supra*, 190 Cal.App.4th at p. 1261.) Our conclusion is reinforced by the fact that the statements at issue were written in the context of a political campaign and appeared in a regular column in which, as appellant acknowledges, Gammon regularly wrote about Perata and questioned his motives and actions. (See *ibid*.)[5]

First, Gammon's statements that Perata had "helped" appellant in her 2006 City Council run after he and De La Fuente had "found" in appellant a candidate to take on Brooks and that they were "behind" her City Council run were based in part on his opinion as a commentator on local politics that, in 2006, De La Fuente "made it clear . . . that he wanted Brooks out of office" as a member of the Oakland City Council and that Perata and Brooks "had clashed often over the years."[6]

---

[5] Indeed, after Perata lost the election, Buel (the Express's then-editor) wrote a tongue-in-cheek article on the Express's blog entitled, "Reader Contest: Help Robert Gammon Find a New Life's Mission," in which he stated: "Astute readers of this blog and web site know that staff writer Robert Gammon has had a slight obsession with former state senator Don Perata. But now that Don has lost the mayor's race and promised to retire his life-size Tony Soprano cut-out, Bob confronts a potential identity crisis of vast proportions. Who is Robert Gammon without his long-time foil? What will his life's mission be without shady financial dealings to expose? Where should he redirect his considerable energies, now that Perata is likely to stalk the earth only as a lobbyist for an assortment of unsavory enterprises? That's where you come in." Buel then offered a prize for the reader who came up with the best idea regarding how Gammon should spend his time in the future.

[6] Appellant claims she submitted admissible evidence showing that a clash between Brooks and Perata had never occurred, which she describes as "an objective fact capable of being proven true or false." We disagree. Appellant stated in her declaration that she did not know whether Perata and Brooks clashed on a personal basis, but that, "as a political watcher[,] I have never seen the two clash on any political matters." That vague statement does not prove that the two politicians did not clash any more than does Gammon's statement to the contrary. Rather, they are both examples of each person's "subjective judgment." (See *Franklin*, *supra*, 116 Cal.App.4th at pp. 385, 389

10

Gammon further based his opinion that Perata had supported appellant's 2006 challenge to Brooks based on the following disclosed—and undisputed—facts: Some of Perata's "best donors helped bankroll" appellant's campaign; donors giving the maximum $600 donation included "longtime Perata donors" Anthony Batarse, Jon Reynolds, John Protopappas, Ana Chretien, Ronald Dreisbach, and John Foster. Gammon added that appellant's biggest contributor in 2008 was "Perata donor" B&B Auto, which gave her $2,000. Also related to Gammon's opinion that Perata was "behind" appellant's 2006 run was the stated fact that "Perata's current campaign manager, Larry Tramutola, managed her message" and that appellant had "reported paying [Tramutola] $24,000 in 2006 to be her campaign manager."[7] That appellant was not personally acquainted with Perata does not mean that he did not support her run—with or without her knowledge—as someone he and De La Fuente believed could unseat Brooks. Moreover, even if untrue, Gammon's theory, based on his interpretation of undisputed facts that were shared with his readers, was protected opinion. (See *Franklin, supra,* 116 Cal.App.4th at pp. 385-386 [stated opinions that neither declare nor imply provably false assertions of fact are protected by First Amendment].)

Second, as to the suggestion in the column that appellant ran for mayor in 2010 as a "favor" to Perata and that Perata was supporting her run, Gammon wrote that appellant had "denied receiving Perata's assistance," but that "Brooks, [Geoffrey] Pete [of the Oakland Black Caucus], and others think the former senator is trying to use Hodge[, an African-American,] to siphon black votes from two of his main competitors—

[statements in emails that a plaintiff was not an "honorable company" and that it displayed a "profound lack of respect for intellectual properties" were "classic assertions of subjective judgment"].)

Moreover, as appellant acknowledged in her declaration, De La Fuente endorsed her for City Council in 2006 and hosted her first campaign fundraiser.

[7] Appellant splits hairs in her attempt to show that Gammon's statements were false. For example, in her declaration, she states: "I used Tramutola LLC for my 2006 City Council campaign. Tramutola LLC is a full service political consulting firm. I hired Tramutola LLC, not Larry Tramutola for my City Council Campaign.

11

Councilwomen Jean Quan and Rebecca Kaplan," whom he wrote had "picked up some key African-American endorsements." Appellant has not disputed the truth of either the statement about her denial or the statement about others' opinions. Nor does she claim that Gammon manufactured Pete's question, quoted in the column: "How would somebody who got her butt whupped by Desley Brooks and was censured by her Peralta colleagues suddenly have the money for billboards and radio ads?" The column thus offered the opinion of both Gammon and others as to appellant's reason for being in the race, and invited readers to decide if they agreed with those opinions.

As to questions in the column about where appellant obtained money she spent on her mayoral campaign while not being prepared to debate,[8] appellant stated in her declaration: "I was not funneled any money to run any campaign. I loaned myself money from my own accounts and my own savings which I have accumulated over the years. I did not suddenly swim in money, I have intentionally saved money." Yvonne Hodge also stated in her declaration: "I opened Marcie Hodge her first savings account when she was months old. I deposited all gifts and money she made from selling newspapers and any odd jobs she had as a child. Her savings grew into the thousands by the time she entered high school." Yvonne Hodge further stated that no money was funneled to appellant in any campaign.

Gammon's questions and suggestions regarding appellant's campaign finances also form part of the basis of his opinion that Perata was behind her run. For example, he asked, "where did she get all that cash?" and opined that her campaign "appears to be suddenly swimming in cash." In support of this observation, he noted in the column that appellant had bought ads on radio stations and billboards and had sent out a "glossy mailer," which he said could typically cost $30,000 to $40,000. He also noted that, in an interview, appellant said she had "loaned her campaign money and [had] received

---

[8] Appellant is referring to the following statements in the column: "So where did she get all that cash and why is she spending so much of it when she won't take the time to prepare for a debate?"

donations from some of the same contributors she counted on in 2006." He continued: "But it could be a long time before her assertions can be verified. According to Alameda County Registrar of Voters and Oakland City Clerk's Office records, she has a history of not reporting her contributions until months after an election is over—in violation of state and local election laws. In both 2006 and 2008, she failed to file campaign statements until five months after the statutory deadline."

Similarly, Gammon wrote: "Records show [appellant] loaned herself $40,000 for her 2006 city council bid. But it's not clear where she got the money—then or now. In August, she declared under penalty of perjury on her statement of economic interests with the City of Oakland that she has no job, no investments, and no other income that pays more than $500 per year. In an interview, Hodge said she has saved money from past jobs. She also said she runs a consulting business. But when asked why she didn't report that business to the city, she replied, 'I'll have to look at that.' " Gammon further noted that Brooks and several other Black leaders in Oakland believed that Perata was "once again helping his political protégé."

Appellant does not challenge the accuracy of Gammon's recounting of what she had stated in either the interview regarding her sources of money or in the declaration for her statement of economic interests. Nor does she claim that the statements about the tardiness of her prior campaign disclosure statements are false. Appellant's statement in her declaration in opposition to the anti-SLAPP motion that she had money from her "own accounts and [her] own savings," which she had "accumulated over the years" does not transform Gammon's opinion into a false statement of fact. Rather, he set forth the facts—including both appellant's explanation of where she obtained funds for her campaigns and the difficulty of confirming that explanation due to the lateness of appellant's past campaign disclosure statements—and, based on those facts, expressed suspicion about the likely source of appellant's campaign funds. His assertions were protected opinion. (See *Franklin*, *supra*, 116 Cal.App.4th at pp. 385, 389.) Nor does appellant challenge the accuracy of Gammon's quotation of Pete, who questioned how she could suddenly have so much money after a losing City Council campaign and

13

censure by her Peralta board colleagues. Again, Gammon relied on undisputed facts to raise questions regarding where appellant obtained the money for her campaign, and to support his opinion that Perata was backing her mayoral bid in an attempt to siphon off Black votes. (See *ibid.*)

Regarding Gammon's statement in the column that "[appellant] won't take the time to prepare for a debate," appellant stated in her declaration that she spent a great deal of time preparing for mayoral forums and debates.

Again, the challenged statement regarding appellant's debate preparation is clearly Gammon's subjective opinion regarding her performance at the prior week's Chamber of Commerce debate, regarding which he wrote: "Even she recognized how badly she was doing, telling the audience at one point: 'You guys are scaring me; I'm stumbling up here.' It looked as if she didn't want to be there, let alone be running for mayor." The comments about appellant's debate preparation and performance are protected opinion, explicitly based on Gammon's own perceptions and interpretations of appellant's actions. (See *Franklin*, *supra*, 116 Cal.App.4th at pp. 385, 389.) Moreover, many of Gammon's statements, including his assertions about appellant's debate performance, such as that she "completely flopped," are best described, in the context of this column on the Oakland mayoral election, as "rhetorical hyperbole." (See *Franklin*, *supra*, 116 Cal.App.4th at p. 389 [statements that plaintiff "stole" copyrighted material, "compromised [defendant company]," and "plagiarized" data appeared "in context as rhetorical hyperbole"]; compare *Hawran v. Hixson*, *supra*, 209 Cal.App.4th at p. 292 [formalized statements made in a press release are "usually intended to be factual, as opposed to rhetorical, persuasive, or evaluative"].) Although Gammon "did not temper [some of] his opinions with words of transparency, neither did he present his opinions as legal truths framed in legal verbiage." (*Franklin*, at p. 389; see also *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 280 [calling plaintiff a "thief" and "liar" in context of a political campaign was hyperbole].)

14

With respect to appellant's assertion that Gammon falsely claimed she was targeting Black voters in her mayoral campaign,[9] appellant stated in her declaration: "My campaign promotions for Oakland Mayor in 2010 were city wide and did not target African-Americans. I targeted all city residents who had voted in the last four elections. [¶] . . . [¶] . . . My billboards were citywide and my radio ads were on stations of many genres and audiences. My billboards were not in predominately black neighborhoods, they were in business districts, by freeways, by the Oakland airport, in North Oakland, [and] near the tunnel connecting Oakland and Alameda and citywide. [¶] . . . My West Oakland billboard was near Bart, [which] is an industrial area of West Oakland.[10] [¶] My campaign mailers targeted to voters [*sic*] who had voted in the last four elections."[11]

Gammon stated in his declaration, regarding appellant's alleged targeting of Black voters: "I myself received a copy in the mail of the four-page mailer described in the Column. I myself observed the location of some of the billboards described in the Column. The location of other billboards and the radio advertisements were described to

---

[9] Appellant is referring to the following statements in the column: "Hodge also seems to be mostly targeting black voters. Her radio ads have run on stations that are popular with black listeners, and her billboards are in predominantly black neighborhoods. So if her campaign is not about taking votes away from [candidates Rebecca] Kaplan and [Jean] Quan, why would she target the black vote in a race when blacks make up about a third of the electorate and she will need support from throughout the city?"

[10] Appellant included with her declaration a list of radio stations from which she purchased radio ads and a list showing the locations of her billboards.

[11] In her opening brief, appellant claims that Gammon's assertions about her apparent targeting of Black voters are belied by the following passages in the same column: "Yet over the past two weeks, Hodge's mayoral campaign appears to be suddenly swimming in cash. Her face adorns giant billboards in East, West, and North Oakland. She's bought ads on Bay Area radio stations. And last week, she blanketed Oakland with a glossy, four-page mailer—an expense that typically ranges from $30,000 to $40,000." However, in context, these statements merely provide additional examples of the kind of hyperbole Gammon used to make his points and do not demonstrate the falsity of his assertions about the radio station ads and billboards, as appellant argues. (See *Franklin*, *supra*, 116 Cal.App.4th at p. 389.)

15

me by persons who had seen or heard them, including by my editor at the time, Stephen Buel."

Gammon's statement in the column that appellant "seems to be mostly targeting black voters" was couched in language of "apparency" (see *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260-261), and was plainly based on his personal belief, expressed in the column, that many of appellant's radio ads were running on stations popular with Black listeners and that her billboards were in predominantly Black areas of Oakland.[12] Gammon's comments were presented, in context, as Gammon's own subjective observations and opinions about what radio stations are popular with Black listeners and what are predominantly Black areas of Oakland, and did not amount to provably false assertions of fact. (See *Franklin*, *supra*, 116 Cal.App.4th at pp. 385, 389.)

With respect to the statement in the column that appellant's "short tenure on the Peralta board has been plagued with scandal"[13] and that she had "used the district's credit card for personal expenses at a time when Peralta was facing financial insolvency, forcing her board colleagues to publicly admonish her," appellant stated in her declaration: "My tenure on Peralta has not been plagued with scandal. I was not publicly

---

[12] Other examples of "apparency" language in the column include Gammon's statements that appellant's campaign appeared to be "suddenly swimming in cash" and that she "seems uninterested in actually winning the race." (See *Baker v. Los Angeles Herald Examiner*, *supra*, 42 Cal.3d at pp. 260-261, fn. omitted ["Where the language of the statement is 'cautiously phrased in terms of apparency,' the statement is less likely to be reasonably understood as a statement of fact rather than opinion"].)

[13] Appellant points out that the print version of the column inaccurately described her as a "neophyte" and as having run in 2008 for an "open seat" on the Peralta Community College District Board of Trustees when in fact she ran for reelection in 2008. The online version of the column, however, corrected this error in the text and also ran a correction at the end of the article, which stated: "*Correction: An earlier version of this story mistakenly stated that Marcie Hodge ran in 2008 for an open seat on the Peralta Community College District Board of Trustees. She ran for reelection that year.*" Moreover, even without the correction, appellant can hardly claim that these misstatements "must be understood in a defamatory sense," as is necessary for statements to be considered defamatory. (*Franklin*, *supra*, 116 Cal.App.4th at p. 385, quoting *Baker v. Los Angeles Herald Examiner*, *supra*, 42 Cal.3d at pp. 260-261.)

16

admonished by board colleagues. There was no agenda item to reprimand me, there was no vote by the board, there was no letter written to me and there was no private or public admonition. There was no board policy on credit card use to violate in July 2009."

Respondents refer to documents in the record relevant to these challenged statements, of which the trial court took judicial notice. Numerous articles and editorials in local newspapers discussed appellant's use of the district credit card for personal expenses.[14] The Peralta board then passed a resolution to request that the State Chancellor of the California Community Colleges appoint "an individual of stature" "to conduct a formal review of claims of impropriety by local media reports . . . ." Subsequently, after the appointed investigator stated at a September 2009 Peralta Board meeting that "the one trustee made a mistake a couple of times and charged some personal stuff to a credit card, which isn't a good thing, but she stepped up and reconciled when it was pointed out," board member Linda Handy responded: "I believe that I was elected because of my integrity and because of my responsibility and that we all need to be held to that. When . . . it comes down to the credit card, you said there was some confusion. I am not confused. It is not my credit card. It is a public trust. It belongs to the district. And yes we will put more policies in place, but as I said, we cannot do policies for common sense. . . . The thing that I think is most important is, it must all pass the sniff test. . . ." Finally, after another investigation of this matter, an Alameda County Grand Jury's final report concluded, inter alia: "Personal charges were made using the district credit cards with no penalty. Based on information provided to the

---

[14] For example, a 2009 Contra Costa Times article reported that "[t]rustee Marcie Hodge piled up more than $4,460 in personal expenses since January 2008. [¶] After the district's chief financial officer repeatedly raised concerns with [Peralta board president] Withrow, who spoke to Hodge several times, Hodge repaid the money. But she has continued to use the credit card for personal items, including nearly $700 in purchases last month. [¶] In nearly every case, Hodge's reimbursement check to the district included a note that she had 'mistakenly' charged personal expenses to the Peralta credit card."

grand jury, trustees only paid the district back when the unauthorized expenditures were made public."

Again, in the context of this column about a candidate for mayor of Oakland, Gammon's statement that appellant's tenure on the Peralta board had been "plagued with scandal" was his opinion and another example of "rhetorical hyperbole" (*Franklin*, *supra*, 116 Cal.App.4th at p. 389), based on disclosed facts, i.e., appellant's much-publicized, repeated use of a district credit card for personal expenditures. Moreover, the statement that her actions "forc[ed] her board colleagues to publicly admonish her," reflected the fact that a fellow Peralta trustee expressed strong disapproval of her actions at a public meeting.[15] Those critical comments certainly could be described as an admonition.[16]

In conclusion, appellant has not made a prima facie showing that the statements she challenged in Gammon's column were defamatory. Presuming as we must that all of the evidence favorable to appellant is true (see *Grewal v. Jammu*, *supra*, 191 Cal.App.4th at p. 989), she has not demonstrated that the opinions expressed by Gammon—an Express writer who was a frequent and vocal critic of Perata—were based on provably

---

[15] That Handy did not mention appellant by name is irrelevant since appellant was the sole board member whose use of the district credit card for personal expenses had been under investigation. The rebuke plainly was directed at appellant. Also, appellant's assertion that the term "admonish" must refer to a formal censure by the board amounts to mere quibbling, especially in the context of this political opinion piece.

[16] In addition, as respondents point out, and the trial court found, Gammon's description of trustee Handy's comments as a public admonition by the board is protected as a "fair and true report in . . . a public journal, of . . . [a] public official proceeding, or . . . anything said in the course thereof . . . ." (Civ. Code, § 47, subd. (d)(1)(C) & (D).) Pursuant to that section, "a media defendant does not have to justify every word of the alleged defamatory material that is published. [Citation.] The media's responsibility lies in ensuring that the 'gist or sting' of the report—its very substance—is accurately conveyed. [Citation.] Moreover, this responsibility carries with it a certain amount of literary license. The reporter is not bound by the straitjacket of the testifier's exact words; a degree of flexibility is tolerated in deciding what is a 'fair report.' [Citation.]" (*McClatchy Newspapers, Inc. v. Superior Court* (1987) 189 Cal.App.3d 961, 975-976; accord, *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 242.) Gammon's characterization of Handy's comments captures the "gist and sting" of what was said. (*McClatchy Newspapers, Inc*, at p. 976.)

18

false facts. (See *Franklin*, *supra*, 116 Cal.App.4th at pp. 384-385; *Overhill Farms, Inc.*, *supra*, 190 Cal.App.4th at p. 1261.) Gammon never purported to definitively know the answers to the questions he posed regarding appellant's motives in running for mayor. He simply offered a subjective and perhaps unjustified theory about a possible connection between appellant's 2010 run for mayor and Perata, based on fully disclosed facts. (*Standing Committee v. Yagman*, *supra*, 55 F.3d at p. 1439.) Any reasonable Express reader would necessarily understand both that the statements in question were part of Gammon's subjective opinion about appellant's run for mayor and that the reader was "free to accept or reject" Gammon's opinion that appellant was running as a spoiler, "based on their own independent evaluation of the facts." (*Ibid.*; accord, *Franklin*, at p. 387.)

Because appellant cannot establish a probability of success as to the first element of a defamation claim—a false assertion of fact—the trial court properly granted respondents' anti-SLAPP motion. (See *Hecimovich*, *supra*, 203 Cal.App.4th at pp. 463-464.)[17]

## *DISPOSITION*

The judgment is affirmed. Costs on appeal are awarded to respondents East Bay Express, Robert Gammon, and Stephen Buel.

---

[17] Because appellant has not made a prima facie showing that Gammon either declared or implied a provably false assertion of fact in his column (see *Hawran v. Hixson*, *supra*, 209 Cal.App.4th at p. 289), we need not address her contention that he acted with actual malice. (See *Nguyen-Lam v. Cao*, *supra*, 171 Cal.App.4th at p. 867.) Likewise, we need not determine whether the Express is in fact a newspaper for purposes of assessing damages. (See Civ. Code, § 48a.)

19

_____

Kline, P.J.

We concur:

_____

Haerle, J.

_____

Lambden, J.