Filed 4/2/15  Welch v. University of San Diego CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MELANIE WELCH, Plaintiff and Appellant, v. UNIVERSITY OF SAN DIEGO et al., Defendants and Respondents. | D064508 (Super. Ct. No. 37-2013-00032302-CU-NP-CTL) |

APPEAL from an order of the Superior Court of San Diego County, William S. Dato, Judge.  Affirmed.

Melanie Welch, in pro. per., for Plaintiff and Appellant.

Paul, Plevin, Sullivan & Connaughton, Michael C. Sullivan, Michael J. Etchepare and Matthew Jedreski for Defendants and Respondents.

Plaintiff Melanie Welch successfully obtained a reversal of an unfavorable judgment in *Welch v. State Teachers' Retirement System* (2012) 203 Cal.App.4th 1 (*Welch III*), an opinion published by an appellate court.  Defendant Shaun Martin, a professor of law employed by defendant University of San Diego who authors an internet

blog devoted to reporting and commenting on recent published opinions, published an article about *Welch III*. In the article, he stated *Welch III* seemed "facially" correct, and perhaps "correct as a legal matter," but mused "maybe all of this is complete justice. But maybe not. Depends profoundly upon your point of view." Welch demanded a retraction of the article and, when Martin refused, filed the present action against Martin and others alleging defamation.[1]

Defendants moved to dismiss Welch's complaint pursuant to Code of Civil Procedure[2] section 425.16, commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57.) The trial court, finding Welch had not carried her burden of showing a reasonable probability she would prevail on the merits at trial (§ 425.16, subd. (b)(1)), granted the motion and this appeal followed.

---

[1] The complaint also named, as additional defendants, the University of San Diego, its President (Mary Lyons), and its Law School Dean (Stephen Ferruolo). For ease of reference, we refer to Martin and the additional defendants collectively as Defendants.

[2] All statutory references are to the Code of Civil Procedure unless otherwise specified.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. Relevant Facts[3]

*Martin's Blog*

Martin authors an internet blog in which he provides summaries of and commentary on recently published appellate court opinions. He tries to post his commentaries the same day the opinion is published and therefore generally relies solely on the content of the published opinion.

On the morning of January 31, 2012, an appellate court issued *Welch III, supra*, 203 Cal.App.4th 1, which Martin read and decided to publish commentary on because of its unique factual history and legal issues, specifically the issue of estoppel that undergirded *Welch III*. He published his blog article that same morning, containing a link to *Welch III*, and reported details of the complex legal history that provided the background for, and holding in, *Welch III*. That background, drawn from *Welch III*, follows.

*Welch's First Lawsuit*

Welch began teaching in the Oakland Unified School District (District) in September 1998. Less than two months later, she was physically attacked by a group of students while working at a middle school in Oakland. (*Welch III, supra,* 203

---

[3]     We accept as true for purposes of our analysis the facts averred by Welch (*Freeman v. Schack* (2007) 154 Cal.App.4th 719, 733), and only consider Martin's evidence to the extent it defeats as a matter of law the evidence submitted by Welch. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269.)

Cal.App.4th at pp. 5-6.) According to the police report, Welch took a hat from two students who were arguing over it on a stairway landing; she was then attacked and injured. The next day, when the school principal asked her to return to work, she was still shaken and upset, and filed a complaint about school safety on October 30, 1998. Although she was subsequently physically cleared to return to work, Welch did not do so and, on November 2, the District notified her it was placing her on administrative leave with pay while it investigated allegations of her erratic behavior, including hitting and kicking children at the middle school. (*Id*. at p. 6.)

In February 1999, the District informed Welch it had decided to release her from her employment contract and would pay her through February 26. Welch filed a petition for writ of mandate to challenge her employment termination. The trial court entered judgment in Welch's favor in the proceeding challenging the termination of her employment, and ordered the District to reinstate her as a probationary employee along with back pay and benefits, because the District's termination was without adequate notice and without an opportunity to appeal. The District appealed but the ruling was affirmed. (*Id*. at p. 7.)

*Welch's Second Lawsuit Seeking Reinstatement*

The District terminated Welch's probationary employment effective June 30, 2001, using proper procedures. Although Welch brought contempt proceedings, asserting the District was in contempt for not reinstating her, the trial court concluded the District was only required to issue back pay and not to reinstate her, and therefore denied Welch's

4

application; the appellate court subsequently affirmed. (*Welch v. Oakland Unified School Dist.* (Cal.App. 1 Dist., Jul. 28, 2005) 2005 WL 1785339.)

*Welch's Lawsuit Generating Welch III*

Welch's action that resulted in *Welch III* about which Martin blogged and over which the current defamation suit emanated, stemmed from her efforts in 2005 to obtain disability retirement benefits from the California State Teachers' Retirement System (CalSTRS) based on her claim the October 1998 attack left her totally disabled and unable to return to work since that date. (*Welch III, supra,* 203 Cal.App.4th at pp. 8-10.) This saga began when Welch phoned CalSTRS about potential benefits available to her, but during that phone call the CalSTRS representative allegedly misinformed Welch of the eligibility requirements for disability retirement by telling her there were no exceptions to the requirement that the member must have five years of credited service to apply for disability retirement benefits, when in fact there was an exception that might have applied to Welch. Welch could have been eligible with less than five years of credited service if she was disabled as the direct result of a bodily injury suffered from an attack while she was working, and she could prove the attack and the resulting disability. However, because of the misinformation, Welch did not apply for disability at that time. (*Id.* at pp. 6-7.)

In 2005, Welch learned for the first time of the "physical attack" exception and applied for benefits. (*Welch III, supra,* 203 Cal.App.4th at pp. 4, 8.) CalSTRS rejected Welch's application for disability retirement benefits on the ground the medical

5

documentation she provided did not substantiate that she had been disabled since her last day of work in 1998. (*Id*. at p. 8.) At an administrative hearing on Welch's challenge to CalSTRS's denial of her application, the ALJ issued a proposed decision in which he concluded (based on Welch's lack of credibility and the absence of any corroborating evidence) she had not been misinformed by CalSTRS in 1999, and also concluded there was no evidence she had been continuously incapacitated from her last day of actual performance. (*Id*. at p. 9.) However, in an administrative mandamus proceeding in the superior court, the trial court found (contrary to the ALJ's finding) Welch *was* misinformed by the CalSTRS representative in 1999 about the eligibility requirements, but nevertheless concluded she did not qualify for benefits because the weight of the evidence did not establish she was disabled since the 1998 attack. (*Id*. at pp. 9-10.)

*Welch III* reversed the trial court's determination, and remanded for new proceedings because, although the record contained evidence to support a finding she was not disabled since 1998, the record also supported a conclusion that if CalSTRS had not provided the misinformation to Welch in 1999 there was a reasonable likelihood she would have been able to obtain and present CalSTRS with medical documentation to support her claim of disability. *Welch III* concluded that, because the lack of evidence was attributable to CalSTRS's own error, Welch was entitled to remand because "CalSTRS should not *be allowed to take advantage of its own errors."* (*Welch III, supra,* 203 Cal.App.4th at pp. 5, 26-27.)

6

C. <u>The Blog Article</u>

A few hours after *Welch III* was published online, Martin published on his blog an article about it.  In the article, he briefly summarized the facts and holding of *Welch III*, which he stated to be that "[District] misled her, so [District] probably [has] to give her benefits," and then observed this "facially . . . seems right," and its use of estoppel against the District "might even be correct as a legal matter," but then stated "let's read between the lines a little bit to figure out what's really going on here."  Martin then highlighted many of the facts apparently adverse to Welch's substantive claims, and concluded by noting that even though the ALJ found her "not credible" and the trial court found she should be denied benefits because she could not show she was disabled in 1999, "the Court of Appeal reverses [and held] that this all might well be [CalSTRS's] fault and strongly hinting that Welch should get benefits.  [¶] . . . [¶] . . . [M]aybe all of this is complete justice.  But maybe not.  Depends profoundly upon your point of view."

Welch wrote Martin to complain about misstatements contained in the blog article, which she deemed to be defamatory, and wanted to show Martin the proof of the falsity of Martin's statements.  Martin responded that he believed all of the factual statements contained in his blog article were derived from *Welch III*, but invited her to let him know if there was any particular factual statement in the blog article that she believed was not a fact contained in *Welch III*, but she did not do so.[4]

_____

[4]     Nearly one year later, she also complained to Dean Stephen Ferroulo, asking Ferroulo review *Welch III* and the blog article.  Shortly after Ferroulo replied that it

7

D. <u>The Complaint</u>

Welch's action appears to have alleged six defamatory statements were contained in the article:

>A.  Martin's statement "let's read between the lines a little bit to figure out what's really going on here."
>
>B.  Martin's statement that the District placed her on administrative leave with pay while it investigated allegations of her erratic behavior, including hitting and kicking children at the middle school, after which Martin stated it was "[m]y strong sense is that these are not new allegations, and that stuff has been going on for a while. Perhaps consistent with her taking the hat of a kid that led to her getting attacked."
>
>C.  Martin's statement, which commented on Welch's claim that Welch's principal had told her that (if she filed a complaint about school safety) he could produce "20 kids who would say that she hit and kicked them," that "maybe the principal was stupid enough to make such a threat . . . .  Or maybe Welch is just making things up. Let's try to remember that when we're assessing equity and credibility."
>
>D.  Martin's description of the original phone call to CalSTRS in which "Welch says she made her phone call and was falsely told she didn't qualify for benefits.  A call to an unnamed person on an unknown date with no evidence other than Welch's testimony."
>
>E.  Martin's statement that "Welch may be totally disabled and unable to work.  But that didn't stop her from prosecuting her case in *pro per*.  Which she does successfully."
>
>F.  Martin's statement that "maybe all of this is complete justice.  But maybe not.  Depends profoundly upon your point of view."

---

appeared the article was reasonably consistent with the facts as stated in *Welch III*, Welch filed her lawsuit.

E. The Anti-SLAPP Motion

Defendants moved to strike the complaint under the anti-SLAPP statute. They argued her claims clearly arose from protected conduct, and Welch could not demonstrate likely success on the merits because (1) the statements were absolutely privileged under the fair report privilege embodied in Civil Code section 47, subdivision (d), and (2) the statements about which she complained were nonactionable statements of opinion and/or were not demonstrably false.

Welch opposed the motion, apparently contending she could demonstrate probable success on the merits because (1) the fair reporting privilege did not apply because the article was a "deliberate distortion[]" of *Welch III* written with actual malice, and (2) the statements about which she complained were actionable statements of fact that were demonstrably false. She does not contest that her claims arose from Defendants' protected activity.

The trial court found the complaint arose out of protected activity, and found Welch had not shown probable success on the merits because the statements, considered in context and as a whole, were protected under the "fair reporting" privilege and/or were nonactionable statements of opinion, and therefore granted the motion to strike the complaint under the anti-SLAPP statute. This appeal followed.

II

APPLICABLE LAW

A. <u>The Anti-SLAPP Statute</u>

The anti-SLAPP law provides, in relevant part, that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The purpose of the statute is to encourage participation in matters of public significance by allowing a court to promptly dismiss unmeritorious actions or claims brought to chill another's valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. (*Id.,* subd. (a).)

The anti-SLAPP law involves a two-step process for determining whether a claim is subject to being stricken. In the first step, the defendant bringing an anti-SLAPP motion must make a prima facie showing that the plaintiff's suit is subject to section 425.16 by showing the plaintiff's claims arise from conduct by the defendant taken in furtherance of the defendant's constitutional rights of petition, or free speech in connection with a public issue, as defined by the statute. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733.) If the defendant does not demonstrate this initial "arising from" prong, the court should deny the anti-SLAPP motion and need not address

the second step. (*City of Riverside v. Stansbury* (2007) 155 Cal.App.4th 1582, 1594;

*Wang v. Wal-Mart Real Estate Business Trust* (2007) 153 Cal.App.4th 790, 811.)

If the defendant satisfies the first step, the burden shifts to the plaintiff to demonstrate there is a reasonably probability he or she will prevail on the merits at trial. (§ 425.16, subd. (b)(1).) In this phase, the plaintiff must show both that his or her claim is legally sufficient and there is admissible evidence that, if credited, would be sufficient to sustain a favorable judgment. (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823, disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5.; *Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 358.) In making this assessment, the court does not weigh the evidence, but does consider both the legal sufficiency of and evidentiary support for the pleaded claims. (*Rohde v. Wolf* (2007) 154 Cal.App.4th 28, 37.)

On appeal, we review de novo the trial court's ruling on the motion to strike. (*Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 339.)

B. Applicable Defamation Principles

To establish her defamation claim, Welch must prove the publication contained a statement of fact (which can support a defamation action) rather than an expression of opinion (which cannot) that was false, defamatory, unprivileged, and had a tendency to injure or cause special damage. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.) Although mere opinions are generally not actionable (*ibid.*), a statement of opinion that implies a

11

false assertion of fact can be actionable.  (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 18-19 (*Milkovich*).)  However, "An opinion . . . is actionable only ' "if it could reasonably be understood as declaring or implying actual facts capable of being proved true or false." ' "  (*Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1471.)  Thus, the inquiry is not merely whether the statements are fact or opinion, but " 'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.' "  (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 113.)  The courts apply a "totality of the circumstances" test to determine both whether (a) a statement is fact or opinion, and (b) a statement declares or implies a provably false factual assertion; that is, courts look to the words of the statement itself and the context in which the statement was made.  (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385-386 (*Franklin*).)  "Under the totality of the circumstances test, '[f]irst, the language of the statement is examined.  For words to be defamatory, they must be understood in a defamatory sense . . . .  [¶]  Next, the context in which the statement was made must be considered.' "  (*Id*. at p. 385.)  Whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court.  (*Overhill Farms, Inc. v. Lopez* (2010) 190 Cal.App.4th 1248, 1261 (*Overhill*).)

Even where the publication contains a statement of fact that is false and defamatory, an anti-SLAPP motion should nevertheless be granted where the plaintiff cannot establish a probability of prevailing on a defamation claim because the publication

12

was absolutely privileged.[5] (*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 784.) The law confers an absolute privilege for a fair and true report of a judicial proceeding in a public journal (Civ. Code, § 47, subd. (d)), and applies if the substance of the publication captures the gist or sting of the statements made in the official proceedings. (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 351.) In assessing this question, the publication is to be measured by the natural and probable effect it would have on the mind of the average reader to whom the publication was directed. (*Franklin, supra,* 116 Cal.App.4th at p. 389.) Where, as here, there is no dispute as to what occurred in the judicial proceeding reported on or as to what was contained in the allegedly defamatory publication, the applicability of the privilege is a question of law. (*McClatchy Newspapers, Inc. v. Superior Court* (1987) 189 Cal.App.3d 961, 976.)

III

ANALYSIS

We conclude the trial court correctly found Welch had not shown the minimal merit necessary to avoid having her complaint stricken under the anti-SLAPP statute because the alleged defamatory statements were either protected by the fair and true

---

5    The privilege in Civil Code section 47 is "relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing. (See, e.g., *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 926-927 . . . [where the plaintiff's defamation action was barred by Civil Code section 47, subdivision (b), the plaintiff cannot demonstrate a probability of prevailing under the anti-SLAPP statute]; [citation].)" (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 323.)

13

report privilege and/or were nonactionable statements of opinion rather than statements of facts.

A. The Privileged Statements

We first consider the alleged defamatory statements that we conclude, as a matter of law, are protected by the privilege conferred on fair and true reports of judicial proceedings.[6]  Welch first contends Martin's statement, describing the original phone call to CalSTRS by Welch as "Welch says she made her phone call and was falsely told she didn't qualify for benefits.  A call to an unnamed person on an unknown date with no evidence other than Welch's testimony," was defamatory because it implied she committed perjury.)  However, Martin's statement is supported by *Welch III's* statement that:

> "In February 2006, CalSTRS rejected Welch's application for disability retirement benefits . . . .  The rejection letter noted that Welch had 'indicated [she had asked about] disability [retirement] benefits with CalSTRS as early as January 1999 and w[as] told [she] did not have coverage because of [her] service credit.'  After noting there was 'no evidence that [Welch] w[as] misinformed about [her] ability to apply for disability in January 1999,' the rejection letter

[6]     Welch, noting the privilege does not apply to a communication to a public journal that "[v]iolates Rule 5-120 of the State Bar Rules of Professional Conduct" (Civ. Code, § 47, subd. (d)(2)(A)), argues no privilege applies because Martin's statements did violate that rule.  However, that rule provides that an attorney "who is *participating or has participated in the investigation or litigation of a matter* shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the member knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." (Rules Prof. Conduct, rule 5-120(A), italics added.)  The plain meaning of that rule proscribes comment only by attorneys involved in the specific litigation as investigators or advocates, neither of which applies to Martin, and Welch cites nothing suggesting the proscription has ever been applied to attorneys unconnected to the litigation.

14

informed Welch she could submit a written request for an 'Executive Review' of her case, which should be accompanied by 'all substantiating evidence of facts supporting your belief that an error or omission exists' . . . . [¶] [When Welch sought Executive Review] . . . *she admitted she did not have any evidence of the call she made in 1999 other than her own testimony*." (*Welch III, supra*, 203 Cal.App.4th at p. 8, italics added.)

Thus, the gist of the statement that she claimed to be defamatory—that she perjured herself because her claim about the 1999 call was supported only by her testimony—is drawn directly from *Welch III*. Although Welch asserts it was unprivileged because it ignored that *Welch III* also noted she presented evidence of similar calls in 2005 in which she received the same misinformation "she *claimed* to have received in 1999" (*Welch III, supra,* 203 Cal.App.4th at p. 9, italics added), the publication " 'need not track verbatim the underlying proceeding' " to qualify for the privilege. (*Carver v. Bonds, supra,* 135 Cal.App.4th at p. 351.) Because Martin's statement—that there was "no evidence other than Welch's testimony" she was misinformed *in 1999*—is drawn directly from *Welch III*, the full and fair report privilege applies to this alleged implied defamatory statement.

The next defamatory statement that Welch apparently claimed to be actionable was Martin's statement that "Welch may be totally disabled and unable to work . . . [b]ut that doesn't stop her from prosecuting her case in *pro per* . . . [w]hich she does successfully," which her defamation complaint appears to assert was an implied accusation that she committed disability fraud. However, *Welch III* states Welch was found disabled (*Welch III, supra,* 203 Cal.App.4th at p. 9 ["Welch was found eligible for

15

SSI benefits on the basis that she was unable to perform any substantial gainful activity"]), and states she acted in propria persona (*id*. at p. 3) and that she was successful (*id*. at pp. 28-29).  The full and fair reporting privilege applies to this statement.

B. <u>The Opinion Statements</u>

A statement of opinion is generally not actionable (*Taus v. Loftus, supra,* 40 Cal.4th at p. 720) and a defamation action based on mere statements of opinion is properly stricken under the anti-SLAPP statute.  (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1049-1054.)  However, a statement of opinion that implies a false assertion of fact can be actionable.  (*Milkovich, supra,* 497 U.S. at pp. 18-19.)  Whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court (*Overhill, supra,* 190 Cal.App.4th at p. 1261), and we conclude the remaining alleged defamatory statements involved statements that, at most, involved nonactionable opinions.

Welch's complaint first alleged, as a defamatory statement, the article's statement "let's read between the lines a little bit to figure out what's really going on here."  This statement contains no factual imputation at all.  At most, this is prefatory language in which Martin invited readers of case law commentaries to join him as he undertook a closer examination of the factual and procedural setting forming the landscape within which *Welch III* was decided.  Welch makes no effort on appeal to explain what defamatory factual imputation was imbedded within that statement, and we conclude that statement, as measured by the natural and probable effect it would have on the mind of

16

the average reader to whom the publication was directed (*Franklin, supra,* 116 Cal.App.4th at p. 389), would not have been understood to carry any factual imputation.

Welch's next specification of defamation was Martin's statement, made after he noted *Welch III* had recited the school district placed Welch on administrative leave while it investigated allegations of her erratic behavior (including hitting and kicking children at the middle school), that it was Martin's "strong sense is that these are not new allegations, and that stuff has been going on a while. Perhaps consistent with her taking the hat of a kid that led to her being attacked." Welch contends this falsely accused her of criminally assaulting children. When applying the "totality of the circumstances" test to determine both whether a statement is fact or opinion and whether it declares or implies a provably false factual assertion, a court must "look to the words of the statement itself and the context in which the statement was made" (*Franklin, supra,* 116 Cal.App.4th at pp. 385-386), starting first with an examination of the language of the statement. (*Overhill, supra,* 190 Cal.App.4th at p. 1261.) The allegedly defamatory statement was prefaced by Martin's statement that it was his "sense" the allegations were not new and had been chronic, and the courts have repeatedly found that statements prefaced by such words as "my impression" (see *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 291) clearly "identified them as statements of opinion and not fact." (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1013 [affirming order granting anti-SLAPP motion: plaintiff could not show probable success on merits because disparaging statements found to be opinion where words "were replete with

17

explicit statements of opinion, such as " 'IMO [in my opinion],' . . . 'I firmly believe,' . . . and 'my guess is' "].)

Moreover, when the "strong sense" qualifier is viewed within "the context in which the statement was made" (*Franklin, supra,* 116 Cal.App.4th at pp. 385-386), the conclusion Martin was stating an opinion he derived from a set of disclosed facts (rather than implying a knowledge of provably false and defamatory facts on which his "strong sense" was based) becomes inexorable. The article, posted within hours of publication of *Welch III*, contained a link to *Welch III* from which the reader could peruse all of the facts available to Martin, and cited the specific facts on which Martin's "strong sense" was drawn. As explained in *Franklin*, the courts will distinguish "opinion statements based upon expressly stated facts with opinion statements based on implied, undisclosed facts." (*Franklin,* at p. 386.) *Franklin* noted the examples used by the court in *Standing Committee on Discipline of U.S. Dist. Court for Cent. Dist. of Calif. v. Yagman* (9th Cir. 1995) 55 F.3d 1430, where the court (applying *Milkovich, supra*, 497 U.S. 1, see *Yagman*, at p. 1438) explained that, "The statement, 'I think Jones is an alcoholic,' for example, is an expression of opinion based on implied facts, [citation], because the statement 'gives rise to the inference that there are undisclosed facts that justify the forming of the opinion,' [citation]. Readers of this statement will reasonably understand the author to be implying he knows facts supporting his view— *e.g.,* that Jones stops at a bar every night after work and has three martinis. If the speaker has no such factual basis for his assertion, the statement is actionable, even though phrased in terms of the author's

18

personal belief. [¶] A statement of opinion based on expressly stated facts, on the other hand, might take the following form: '[Jones] moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair . . . with a drink in his hand. I think he must be an alcoholic.' [Citation.] This expression of opinion appears to disclose all the facts on which it is based, and does not imply that there are other, unstated facts supporting the belief that Jones is an alcoholic. [¶] A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning." (*Yagman,* at p. 1439, fn. omitted.)

*Franklin*, applying *Yagman's* approach, explained:

> "The rationale for this rule is that '[w]hen the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts.' [Citation.] When the facts supporting an opinion are disclosed, 'readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts.' ([Citation;] *Partington v. Bugliosi* (9th Cir. 1995) 56 F.3d 1147, 1156-1157 ['when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment']; *Chapin v. Knight-Ridder, Inc.* (4th Cir. [1993]) 993 F.2d 1087, 1093 ['[b]ecause the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related']; [citation].)." (*Franklin, supra*, 116 Cal.App.4th at p. 387.)

We conclude, based on the words used and the disclosed context within which those words were used, the readers to whom the publication was directed understood

19

Martin was expressing an opinion based on expressly stated facts and was not implying his opinion was premised on undisclosed false facts.

Welch's next specification of defamation was Martin's statement commenting on *Welch III's* report that Welch claimed the school had placed her on administrative leave because of her complaint about safety in the school and specifically claimed she was told by the principal that "if she filed a complaint 'he had 20 kids who would say that [she] had hit and kicked them.' " (*Welch III, supra,* 203 Cal.App.4th at p. 6, fn. 3.) Welch asserted Martin's statement—that "maybe the principal was stupid enough to make such a threat . . . . Or maybe Welch is just making things up. Let's try to remember that when we're assessing equity and credibility"—falsely accused her of perjury. We again apply the totality of the circumstances test to determine both whether the statement was fact or opinion and whether it declared or implied provably false factual assertions, and start with the words of the statement itself. The statement clearly states there are two possibilities—that the principal was "stupid enough" to make such a threat or that Welch "is just making things up"—and impliedly opines on which view Martin adopts. However, as previously explained, the courts have recognized statements are likely to be understood by the reader as opinion when, as here, the statement is "phrased in terms of apparency, cautiously or otherwise" (*Hawran v. Hixson, supra,* 209 Cal.App.4th at p. 291), and because Martin disclosed the context within which those words were used, we conclude readers to whom the publication was directed understood Martin was

expressing an opinion based on expressly stated facts drawn from *Welch III* rather than implying his opinion was premised on undisclosed false facts.

Welch's final claimed defamatory statement was that Martin, summarizing *Welch III's* holding that "[CalSTRS] misled her, so [CalSTRS] probably [has] to give her benefits," concluded by saying "maybe all of this is complete justice. But maybe not. Depends profoundly upon your point of view." Welch makes no effort on appeal to explain what defamatory *factual* imputation was imbedded within that statement, and her complaint below likewise did not explain what false fact was conveyed by this statement. We conclude that statement, which told the reader the result reached by the appellate court in *Welch III might or might not* be "complete justice . . . *depend*[*ing*] *profoundly upon your point of view,*" was at most an implicit expression of Martin's opinion (his "point of view") along with an invitation to readers to form their own opinion. We conclude the natural and probable effect that the statement would have on the mind of the average reader to whom the publication was directed (*Franklin, supra,* 116 Cal.App.4th at p. 389) was that the reader would have understood it expressed Martin's opinion but did not carry any factual imputation.

D. <u>Attorneys Fees</u>

Defendants argue they are entitled to an award of attorney fees on appeal. Addressing and agreeing with the same argument raised by Defendants here, the court in *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1499-1500 stated: "The defendants correctly contend that if they prevail on this appeal they are entitled to recover their

21

appellate attorney fees. A statute authorizing an attorney fee award at the trial court level includes appellate attorney fees unless the statute specifically provides otherwise. [Citations.] Under section 425.16, subdivision (c), a prevailing defendant on a special motion to strike a SLAPP suit 'shall be entitled to recover his or her attorney's fees and costs.' The statute does not preclude recovery of appellate attorney fees by a prevailing defendant-respondent; hence they are recoverable." (Accord, *Baharian-Mehr v. Smith* (2010) 189 Cal.App.4th 265, 275-276 [granting costs, including attorney fees, on appeal and remanding matter to trial court for determination of proper amount of fees].)

## DISPOSITION

The judgment of dismissal is affirmed. Respondents shall recover their costs and attorney fees on appeal, the amount of which shall be determined by the trial court on remand.

McDONALD, Acting P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.

22