Filed 11/19/24  Vanga v. Juarez CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| KING VANGA,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PRISCILLA N. JUAREZ,<br><br>        Defendant and Appellant. | A169427<br><br>(San Francisco County<br>Super. Ct. No. CGC-23-606993) |

Defendant Priscilla N. Juarez (Defendant) appeals from the trial court's order denying her special motion to strike pursuant to Code of Civil Procedure section 425.16, the anti-SLAPP statute.[1]  We reverse.

BACKGROUND

On June 25, 2021, plaintiff King Vanga (Plaintiff) was involved in a car accident that resulted in the deaths of Defendant's mother-in-law and father-in-law.

Media stories in the subsequent days, which Defendant read, stated Plaintiff had been arrested and law enforcement reported he was under the

---

[1] "SLAPP" stands for "strategic lawsuits against public participation." (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 615.)  All undesignated statutory references are to the Code of Civil Procedure.

influence of drugs and/or alcohol at the time of the accident. Defendant saw Plaintiff's online booking information stating he had been arrested for battery against a peace officer, resisting or obstructing a peace officer, removing a firearm from a peace officer, vehicular manslaughter with gross negligence, and two counts of driving under the influence causing bodily injury. Two of the decedents' family members told Defendant they spoke to one of the responding law enforcement officers on June 29, 2021, and he informed them that: he thought Plaintiff was under the influence at the time of the accident; Plaintiff declined to submit to a breathalyzer test at the scene of the accident; Plaintiff tried to remove a firearm from another officer; and Plaintiff had been arrested for driving under the influence and other charges.

On June 30, 2021, a criminal complaint was filed charging Plaintiff with two counts of gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)), resisting an executive officer (*id.*, § 69), attempting to take a peace officer's firearm (*id.*, § 148, subds. (a), (d)), and battery upon a peace officer (*id.*, § 243, subd. (b)).

On July 2, 2021, Defendant wrote an email to Stanford University (Stanford), where Plaintiff was then enrolled as an undergraduate student. The email stated:

"Re: Your student [Plaintiff]

"To whom it may concern,

"I am writing this letter to you because it has been brought to my attention that one of your students, [Plaintiff], whom [*sic*] is currently in your Computer Science Program projected to graduate 2023, has violated and tainted Stanford[']s Code of Conduct values, to the most extreme measure. As stated in Stanford University's Code of Conduct policies, 'All members of the University Community are responsible for sustaining the high ethical

2

standards of this institution, and the broader community in which we function.' Stanford University's code also states that, 'This code is a shared statement of our commitment to upholding the ethical, professional and the legal standards we use and the basis for our daily and long term decisions and actions.' You state that all members of this community MUST comply with these policies, standards, laws and regulation.

"On the night of June 25th, 2021 at approximately 9:40 pm [Plaintiff] was arrested and detained in Atwater, C[A] on multiple charges. One of which was murdering my beloved in-laws. [Names redacted.] Both only 56 years old. Police reports claim that [Plaintiff], 20 years old[,] was driving at an extremely accelerated speed on Santa Fe ave [*sic*] in Atwater California all while intoxicated most likely by both alcohol and drugs. Not only was he completely irresponsible but also underage. My husband, myself and his family are completely broken and devastated. This does not even begin to explain the pain we feel.

"After murdering both of my in-laws it is my understanding, and knowledge that [Plaintiff], (20) had tried to flee the scene after slamming into my in-laws sending their car 40+ feet from the collision point. After police arrived and tried detaining [Plaintiff], he then tried to grab the officer[']s weapon and obstructed the officer[']s attempt to arrest him. There are witness [*sic*] to attest to these behaviors committed by [Plaintiff], and police reports that confirm his actions.

"I wanted to share with you a little bit about who my in-laws were and just how important they were to my husband, myself and all who knew them. . . .

"Due to the poor judgement, behaviors and actions of your student, [Plaintiff], to say we are devastated broken [*sic*] would be an understatement.

3

[Plaintiff] (20) has stollen [*sic*] from us so many more memories we had hoped to make with my in-law[s] [names redacted]. My 4 children will [*sic*] who are still so young will no longer be able to build memories but only hold tight the short time they had with them.

"I understand that it is not my place to take action or allocate his consequences within the judicial system nor with Stanford, however, I do believe that all who commit such a crime should in fact and must be held responsible for their irresponsible actions and behaviors. In this case those behaviors led to the murder of my two amazing in-laws [names redacted]. I truly believe that [Plaintiff] is Not [*sic*] the kind of person you want representing your institution nor your community in which [*sic*] you hold in such high regards. I would hope that Stanford would take proper action in dismissing this man as an active student of your morally prestigious institution.

"Thank you[] for your time and attention to this urgent matter. If any further action or requests are needed please do not hesitate to reach out.

"Sincerely,

"[Defendant]"

Between August 2021 and April 2022, multiple analyses of Plaintiff's blood sample from the night of the accident showed no alcohol or drugs present. Defendant learned the results of the blood analyses in a March 2023 phone call with the district attorney's office. The same month, Plaintiff's criminal complaint was amended to change the two counts of gross vehicular manslaughter while intoxicated to two counts of vehicular manslaughter (Pen. Code, § 192, subd. (c)(1)). Plaintiff denies driving unlawfully, resisting a peace officer, or attempting to flee the scene.

4

At some point, Plaintiff requested access to his Stanford student file. In October 2022, Stanford granted access and Plaintiff viewed Defendant's email and communications from others to Stanford.[2]

In June 2023, Plaintiff filed a defamation lawsuit over the communications to Stanford from Defendant and others. Defendant filed an anti-SLAPP motion. The trial court found Defendant's email was protected activity under the anti-SLAPP law, but further found Plaintiff demonstrated a probability of prevailing on the merits. The trial court denied Defendant's motion, and this appeal followed.

DISCUSSION

"A court evaluates an anti-SLAPP motion in two steps. 'Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." ' [Citation.] If the plaintiff fails to meet that burden, the court will strike the claim." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.) " ' "We review de novo the grant or denial of an anti-SLAPP motion." ' " (*Muddy Waters, LLC v. Superior Court* (2021) 62 Cal.App.5th 905, 916.)

Defendant argues the trial court erred in finding Plaintiff established a probability of prevailing on his defamation claim against her. Plaintiff disagrees and also argues we should affirm on the alternate ground that Defendant's email is not protected conduct under the anti-SLAPP statute. (See *Klem v. Access Ins. Co.* (2017) 17 Cal.App.5th 595, 609 ["A prevailing

---

[2] Stanford initially redacted Defendant's name; Plaintiff learned her identity after receiving the unredacted email in response to a subpoena following the filing of this lawsuit.

party on an anti-SLAPP motion need not file a cross-appeal to preserve his disagreement with the trial court's reasoning"].)

I.    *Step One: Protected Activity*

The trial court found Defendant's email protected activity under section 425.16, subdivision (e)(2), "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law."  We agree.

"[A] statement is 'in connection with' litigation under section 425.16, subdivision (e)(2) if it relates to the substantive issues in the litigation and is directed to persons having some interest in the litigation." (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1266 (*Neville*).)  The provision "has been held to protect statements to persons who are not parties or potential parties to litigation, provided such statements are made 'in connection with' pending or anticipated litigation." (*Id.* at p. 1270.)  It is undisputed that Defendant's email relates to the issues in Plaintiff's pending criminal case and expressly references Plaintiff's arrest and charges.  Moreover, Stanford, where Plaintiff was enrolled as an undergraduate student, had some interest in Plaintiff's criminal case: both an interest in the welfare of Plaintiff and his fellow students,[3] as well as a concern for its own reputation.

Plaintiff argues Defendant's email is not protected conduct under subdivision (e)(2) because Stanford does not have the right *kind* of interest in Plaintiff's criminal case.  While conceding that courts have not defined the

---

[3] Plaintiff averred that in December 2021, Stanford sent him a letter referring to the criminal case and expressing "concern[] for your mental and physical wellbeing . . . , as well as for the safety of the university community . . . ."

6

precise contours of the requisite interest, Plaintiff relies on litigation privilege cases for the proposition that such an interest must be "an economic interest in the litigation or a risk of liability resulting from the litigation." Plaintiff's attempt to equate anti-SLAPP-protected activity with conduct covered by the litigation privilege is unavailing. An "attempted analogy between the litigation privilege and the anti-SLAPP statute is inapt. . . . [T]he litigation privilege is an entirely different type of statute than section 425.16. The former enshrines a substantive rule of law that grants absolute immunity from tort liability for communications made in relation to judicial proceedings [citation]; the latter is a procedural device for screening out meritless claims." (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 737.) While "courts 'look[] to the litigation privilege [Civil Code section 47] as an aid in construing the scope of [section 425.16,] subdivision [(e)(2)] with respect to the first step of the two-step anti-SLAPP inquiry,' " the applicability or inapplicability of the litigation privilege "does not resolve whether [a communication] is a protected activity under section 425.16, subdivision (e)(2)." (*Neville*, *supra*, 160 Cal.App.4th at p. 1263.)

Cases involving the first prong of the anti-SLAPP analysis make clear that the communication recipient's interest in the litigation or other covered proceeding does not need to be economic or involve a risk of liability. Most notably, anti-SLAPP cases have held letters or articles published in newspapers regarding legislative, executive, or judicial proceedings to be protected activity under section 425.16, subdivision (e)(2), where the recipient is the general public. (*Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1160–1161 [party's letter relating to issues in pending litigation published in newspaper constituted protected activity under subdivision (e)(2)]; *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 863

7

[newspaper articles covering issue before county board of supervisors and state and federal courts constituted protected activity under subdivision (e)(2)].) As another example, in *Contemporary Services Corp. v. Staff Pro Inc.* (2007) 152 Cal.App.4th 1043 (*Contemporary Services*), one business sued a competitor for unfair competition. (*Id.* at pp. 1047–1048.) Following discovery, the president of the competitor wrote "nine individuals," providing an " 'update' " on the litigation " '[d]ue to your involvement with this case' " as deposition witnesses, producers of documents, or owners of a business about which the competitor produced documents. (*Id.* at p. 1050.) The Court of Appeal held the communication constituted protected activity under subdivision (e)(2) because it "constitutes a litigation update, which describes the parties' contentions and court rulings, and is directed to individuals who had *some involvement in the parties' litigation.*" (*Contemporary Services*, at p. 1055, italics added; see also *Neville*, *supra*, 160 Cal.App.4th 1267–1268 [employer's letter to clients who had been approached by former employee in violation of former employee's employment contract was protected activity under subdivision (e)(2) where the clients were "persons whom [the employer] reasonably could believe had an interest in the dispute as potential witnesses to, or unwitting participants in, [the former employee's] alleged misconduct"].) Accordingly, and mindful of the Legislature's directive that the anti-SLAPP statute "shall be construed broadly" (§ 425.16, subd. (a)), we reject Plaintiff's attempt to limit the application of subdivision (e)(2) to communications sent to parties with an economic interest or risk of liability in the proceeding.

Plaintiff next argues section 425.16, subdivision (e)(2) does not apply because Defendant's email did not further the objectives of a party in the criminal case, again relying on litigation privilege cases. Even in the context

8

of the litigation privilege, this standard has not been applied to require, as Plaintiff suggests, that Defendant's email "seek evidence, testimony, an investigation, or a potential resolution of" Plaintiff's criminal case. " 'To be protected by the litigation privilege, a communication must be "in furtherance of the objects of the litigation." ' [Citation.] [¶] Put differently, the statement must ' "be connected with, or have some logical relation to, the action, i.e., . . . not be extraneous to the action." ' " (*Bassi v. Bassi* (2024) 101 Cal.App.5th 1080, 1097.) Defendant's email noted criminal charges had been brought against Plaintiff and discussed the underlying factual allegations and supporting evidence. Like the criminal prosecution, Defendant's email sought to hold Plaintiff accountable for his conduct on the night of the accident based on evidence from the criminal investigation. We agree with the trial court that the email constituted protected activity under subdivision (e)(2).[4] (Cf. *Bassi*, at p. 1098 [communications not covered by subdivision (e)(2) where the content was "irrelevant or highly peripheral to the proposed . . . litigation"].)

II.     *Step Two: Probability of Prevailing*

" ' "Defamation is 'a false and unprivileged publication that exposes the plaintiff "to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." ' " ' " (*Dickinson v. Cosby* (2017) 17 Cal.App.5th 655, 685 (*Dickinson*).) Plaintiff argues the following statements in Defendant's email are defamatory: "a) Plaintiff murdered [the decedents], b) Plaintiff was

---

[4] Because of this conclusion, we need not and do not decide whether, as the parties dispute, Defendant's email is also protected activity under section 425.16, subdivision (e)(4), covering "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

driving under the influence, c) Plaintiff had attempted to flee the scene, and d) Plaintiff violated Stanford's Code of Conduct by engaging in this conduct."

A. *Nonactionable Opinion*

As to the first and last statements—that Plaintiff murdered the decedents and violated Stanford's Code of Conduct—Defendant contends these statements are nonactionable opinions. We agree. Further, we so rule as to the statement that Plaintiff was driving under the influence.

1. *Legal Background*

"In determining whether disparaging remarks are actionable defamation, ' "the question is not strictly whether the published statement is fact or opinion . . . [r]ather, the dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact." [Citation.]' [Citation.] In other words, an opinion or legal conclusion is actionable only ' " 'if it could reasonably be understood as declaring or implying actual facts capable of being proved true or false.' " [Citation.] Thus, an opinion based on implied, undisclosed facts is actionable if the speaker has no factual basis for the opinion. [Citation.] An opinion is not actionable if it discloses all the statements of fact on which the opinion is based and those statements are true. [Citation.] An opinion is actionable if it discloses all the statements of fact on which the opinion is based and those statements are false.' " (*Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 527 (*Integrated Healthcare*).) "The rationale for this rule is that '[w]hen the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts.' [Citation.] When the facts supporting an opinion are disclosed, 'readers are

10

free to accept or reject the author's opinion based on their own independent evaluation of the facts.' " (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 387 (*Franklin*).)

"Whether a statement declares or implies a provably false assertion of fact is a question of law for the court to decide [citations], unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood." (*Franklin*, *supra*, 116 Cal.App.4th at p. 385.)  Courts use a "totality of the circumstances test . . . to determine whether the statement in question communicates or implies a provably false statement of fact.  [Citation.]  Under the totality of the circumstances test, '[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered.' " (*Ibid.*)  " 'This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed.' " (*Id.* at p. 389.)

Two cases are illustrative.  In *Franklin,* the defendant wrote emails to one of the plaintiff's clients that included the following: " 'I thought you might find this e-mail from [the plaintiff] very disturbing.  Please follow the path. [ ] [The plaintiff] stole copyrighted materials from [a third party] and placed this data on their websites as their own.  Please review the music wire 2.50 inch crimped prints.  [T]hey still have [the third party's] title block on the documents. . . .' " (*Franklin, supra*, 116 Cal.App.4th at p. 380.)  The Court of Appeal held the emails "purported to interpret copyright law and contract law and apply that law to fully disclosed facts," to wit, a website and link therein included in the defendant's emails.  (*Id.* at p. 387.)  The "e-mails

11

disclosed the facts on which [the defendant's] opinions were based and did not imply the existence of any other facts on which the opinions were based." (*Id.* at p. 388.) "The facts upon which [the defendant's] opinions were based were provably true because the existence, content, and layout of the Web sites were not in dispute in any material way. Because we are not determining the truth or reasonableness of [the defendant's] opinions, the issue in determining whether the Web sites were provably true is not whether the Web sites made truthful assertions of fact, but whether the Web sites in fact existed and made the assertions claimed." (*Ibid.*) In considering the context, the court also noted the defendant "is not, and did not purport to be, an attorney. The average reader therefore would not have assumed the statements in the . . . e-mails had the weight of a legal opinion. Although [the defendant] did not temper his opinions with words of transparency, neither did he present his opinions as legal truths framed in legal verbiage." (*Id.* at p. 389.) The court concluded the statements in the emails were nonactionable opinions. (*Id.* at p. 390.)

In *Integrated Healthcare,* the defendant wrote an email stating the plaintiff, a company operating certain hospitals, " 'appears to be underwater and I don't think [the plaintiff] can get an investor to pony up the $20 million, for the 60–70 million shares of stock which they are selling. Admissions are down 20%. They got a reduction of costs by dumping [a company from which the plaintiff acquired hospitals] by 13%, and increased insurance payment of 7% (but that is neutralized by the factoring). Then their nursing salaries went up 8%—so they're in the red. No way to get out. That is ominous. What would the buyer get buying [the plaintiff's] stock? Control of [the plaintiff], but not the land? Sounds like its [*sic*] going BK [(bankrupt)]. . . .' " (*Integrated Healthcare*, *supra*, 140 Cal.App.4th at p. 520.) The Court of

12

Appeal held the email stating the defendant's "opinions" that the plaintiff "is 'underwater,' [the plaintiff] is unable to find investors to purchase its stock, and it is going bankrupt" also "set[] forth the basis for these opinions and does not imply other facts. Specifically, these opinions appear based on the following facts: 'Admissions are down 20%. They got a reduction of costs by dumping [a company] by 13%, and increased insurance payment of 7% (but that is neutralized by the factoring). Then their nursing salaries went up 8% . . . .' Because the e-mail discloses the facts underlying [the defendant's] opinions, the opinions are actionable only if these facts are false." (*Id.* at p. 529.)

2. *Analysis*

We first consider the language of Defendant's email. "In considering the *language* of the statement itself, we look at whether the purported opinion discloses all of the facts on which it is based and does not imply that there are other, unstated facts which support the opinion. If that is the case, the statement is defamatory only if the disclosed facts themselves are false and defamatory. [Citation.] We also consider whether the statement was cautiously phrased in terms of the author's impression." (*Dickinson*, *supra*, 17 Cal.App.5th at p. 686.) Like the communications in *Franklin* and *Integrated Healthcare,* Defendant's email included both the challenged assertions—that Plaintiff murdered the decedents, drove while intoxicated, and violated the Stanford Code of Conduct—and the facts upon which the assertions were apparently based: "Police reports claim[ing]" Plaintiff "was driving at an extremely accelerated speed . . . while intoxicated most likely by both alcohol and drugs," "witness . . . and police reports that confirm" the assertions, and Plaintiff's arrest and detention "on multiple charges." The email does not imply any other, undisclosed facts; for example, Defendant

13

does not purport to be an eyewitness or otherwise have any firsthand knowledge of the incident. (Cf. *Dickinson*, at p. 689 [letter claiming rape allegation was fabricated "was authored by [the alleged rapist's] attorney, who was speaking for [the alleged rapist], who, in turn, would certainly know whether or not he sexually assaulted [the alleged victim]"].) Although Defendant did not expressly state the challenged statements were her opinion or belief, she referred to police reports and witness statements; identified the date of the incident, approximately a week before her email; and stated Plaintiff had been arrested and detained but did not claim he had been found guilty.

We next turn to the context. "In considering the *context* of the statement, we look at facts including the audience to whom the statement was directed [citation], the forum in which the statement was made [citation], and the author of the statement." (*Dickinson*, *supra*, 17 Cal.App.5th at p. 686.) Stanford, an institution of higher education, would not construe Defendant's email as stating that Plaintiff had already been convicted of any crime arising from the then-recent accident or that any of the underlying alleged conduct had been proven true. Indeed, there is no evidence that Stanford took any action following receipt of Defendant's email; the first communication to Plaintiff from Stanford about the accident appears to have been in December 2021, in a letter acknowledging the pending criminal allegations and noting Plaintiff's denial of wrongdoing. As for Defendant, she "is not, and did not purport to be, an attorney. The average reader therefore would not have assumed the statements in the . . . e-mail[] had the weight of a legal opinion." (*Franklin*, *supra*, 116 Cal.App.4th at p. 389.) Instead, Defendant explicitly identified herself as a family member of the decedents; openly expressed her grief at their death; and stated her hope that Stanford

14

"take proper action in dismissing this man as an active student of your morally prestigious institution," thereby identifying her role as an advocate.

Plaintiff argues Defendant's email was serious in tone and did not contain hyperbole or rhetoric. The contention is not material because there is no requirement that nonactionable opinions *also* be hyperbolic. (See *Franklin*, *supra*, 116 Cal.App.4th at p. 385 ["[S]atirical, hyperbolic, imaginative, or figurative statements are protected because 'the context and tenor of the statements negate the impression that the author seriously is maintaining an assertion of actual fact' "].) Similarly, that one of the challenged statements accused Plaintiff of murdering the decedents—a heinous crime—is not determinative. " 'Accusations of criminal activity, like other statements, are not actionable if the underlying facts are disclosed.' " (*Id.* at p. 388.)

Accordingly, considering both the language and the context of Defendant's email, we find the assertions that Plaintiff murdered the decedents, drove while intoxicated, and violated Stanford's Code of Conduct to be opinions based on disclosed facts. The opinions are therefore "actionable only if these facts are false." (*Integrated Healthcare*, *supra*, 140 Cal.App.4th at p. 529.)

Plaintiff argues Defendant's opinions are based on "multiple incorrect facts," to wit, "that Plaintiff was driving at an extremely accelerated speed; that he was driving while intoxicated, likely by both alcohol and drugs; and that he tried to flee the scene of the accident." But "[b]ecause we are not determining the truth or reasonableness of [Defendant's] opinions, the issue . . . is not whether the [witness and police reports] made truthful assertions of fact, but whether the [witness and police reports] in fact existed and made the assertions claimed." (*Franklin*, *supra*, 116 Cal.App.4th at p. 389.)

15

Plaintiff does not dispute that, at the time Defendant wrote her email, police claimed Plaintiff hit the decedents while intoxicated and driving at excessive speeds.[5] Plaintiff argues Defendant's email did not disclose that she also relied on "a private conversation between a police officer and [Defendant's] sister-in-law." We are not persuaded that, for these purposes, the distinction between an officer's oral statement and written report is material.

We note that the witness and police reports in the record do *not* state that Plaintiff tried to flee the scene. Defendant averred, "I do not remember for certain where I heard that [Plaintiff] tried to flee the scene when he was arrested. I believe that I heard it from my relatives, related to me as something one of the police officers told them . . . ." This statement is therefore not a nonactionable opinion. (*Integrated Healthcare*, *supra*, 140 Cal.App.4th at p. 527 [" 'An opinion is actionable if it discloses all the statements of fact on which the opinion is based and those statements are false' "].)

In sum, we conclude Plaintiff failed to establish a probability of prevailing on his defamation claim as to Defendant's statements that Plaintiff murdered the decedents, drove while intoxicated, and violated Stanford's Code of Conduct.

B. *Damages*

As to the remaining challenged statement—that Plaintiff attempted to flee the scene of the accident—we consider whether Plaintiff established damages caused by this statement.

Plaintiff averred as follows: "The realization that the Letters [from Defendant and others] had circulated among influential members of

---

[5] Indeed, a witness declaration and police report submitted by another defendant below so state.

Stanford's administration, including the Dean of Students and the Office of the President, caused me to experience significantly increased anxiety, depression, and social isolation," and he "had (and continue[s] to have) profound anxiety about how the Letters will negatively affect my academic and professional reputation."

There is no evidence that any pain and suffering was attributable to the statement that he attempted to flee the scene—a substantially less damaging statement than the ones that he committed murder or drove while intoxicated. Because Plaintiff failed to provide any evidence of damages resulting from the statement that he attempted to flee the scene, he failed to demonstrate a probability of prevailing on a defamation claim relying on this statement. Accordingly, we will reverse the trial court's order denying Defendant's anti-SLAPP motion.[6]

## DISPOSITION

The order is reversed and remanded with directions to enter a new order granting Defendant's anti-SLAPP motion. Defendant is awarded her costs on appeal.

---

[6] We need not, and do not, decide any of the other issues briefed by the parties with respect to whether Plaintiff established a probability of prevailing. We also need not decide whether, as Plaintiff contends, the trial court erred in failing to sustain an evidentiary objection asserted by Plaintiff below as to evidence on which we have not relied.

SIMONS, J.

We concur.

JACKSON, P. J.
CHOU, J.

(A169427)